503 So.2d 1232 (1986)
FLORIDA STEEL CORPORATION, Petitioner,
v.
ADAPTABLE DEVELOPMENTS, INC., Etc., et al., Respondents.
No. 66560.
Supreme Court of Florida.
December 24, 1986.
*1233 Neil J. Berman of Berman & Ergas, Miami, for petitioner.
Rosemary Cooney of Paxton, Crow, Bragg & Austin, West Palm Beach, and Brian G. Shannon of Jaffe, Snider, Raitt & Heuer, Detroit, Mich., for respondents.
PER CURIAM.
The Fourth District Court of Appeal has certified the following question as one of great public importance:
Does the ruling in Alton Towers, Inc. v. Coplan Pipe & Supply Co., 262 So.2d 671 (Fla. 1972) apply to a situation where a construction project is interrupted for a significant period of time by the contractor's abandonment of the job site?
Florida Steel Corp. v. Adaptable Developments, Inc., 462 So.2d 578, 579 (Fla. 4th DCA 1985). This Court has jurisdiction pursuant to article V, section 3(b)(4) of the Florida Constitution. We answer in the negative and quash the opinion of the district court.
This case began as an action by Florida Steel to collect moneys due it for materials it had supplied to Logan and Clark, a general contractor, for use in constructing a high-rise condominium that Logan and Clark had contracted to build for a group of developers collectively known as Adaptable Developments. Logan and Clark hired Florida Steel, in October 1980, to supply the reinforcing steel needed for the building. Florida Steel had no contract with Adaptable. Adaptable knew that Florida Steel supplied material to the job site, however, because Logan and Clark submitted monthly bills to Adaptable containing a breakdown of the costs showing who supplied what and for how much. Also, Adaptable issued joint checks monthly made out to both Logan and Clark and Florida Steel. Pursuant to its contract with Logan and Clark, Florida Steel supplied the project with steel until April 1981 at which time Logan and Clark's financial difficulties caused it to abandon the project. At the time of abandonment Florida Steel had not been paid for a portion of the steel it had supplied, and in June 1981 it filed a timely claim of a lien in accordance with section 713.06(2)(a), Florida Statutes (1981).[1] Construction on the project remained stopped for the next eight months until Adaptable hired another construction company, Rogers and Ford, to complete the building. The new contract, however, cost more than that which had been negotiated originally with Logan and Clark. Adaptable filed a new notice of *1234 commencement,[2] and work resumed on the project in January 1982.
In May 1982 Florida Steel brought suit to foreclose its claimed statutory and equitable liens against Adaptable and to recover the moneys owed it by Logan and Clark. The trial court entered a default judgment against Logan and Clark and found Adaptable liable for the amount of Florida Steel's lien plus prejudgment interest. On rehearing the court struck the award of prejudgment interest. Florida Steel appealed the denial of prejudgment interest and Adaptable cross-appealed the determination of liability. The district court reversed the trial court on the issue of Adaptable's liability on the authority of Alton Towers, Inc. v. Coplan Pipe & Supply Co., 262 So.2d 671 (Fla. 1972), and so mooted the issue of prejudgment interest. Because extending the rule of Alton to the present situation would leave subcontractors and materialmen unpaid on abandoned projects in Florida, the district court certified the question to us.
In Alton Towers a builder entered into a contract with a plumbing company which in turn purchased the supplies for the building from a materialman. The plumbing company went bankrupt during construction, still owing the supplier money for materials it had provided. Alton, the builder, retained a new plumbing company to complete the job but at a cost greater than that quoted in its original contract with the bankrupt company. The owner argued that the cost of completing the project should be subtracted from the amount remaining unpaid on the original contract, thus leaving no fund out of which the supplier could be paid. The supplier countered that it should be paid out of the fund remaining at the time of abandonment before the funds could be directed toward completion. We found the owner entitled to the protection of section 713.06, Florida Statutes (1971),[3] provided he strictly complied with the requirements of the statute.
In the present case the owner, Adaptable Developments, did not comply with all the requirements of chapter 713. The statute meticulously lays out the procedures which must be followed. Section 713.07(4) requires that an owner who recommences construction on an abandoned job must, if he has not paid the lienors in full or pro rata, file an affidavit of intention to recommence and a new notice of commencement or he cannot subtract the cost of completing the project from the contract price.[4] It is a rule of statutory construction that any statute in derogation of the common law requires strict compliance with its provisions by one seeking to avail himself of its benefits. Shaw v. DelMar Cabinet Co., 63 So.2d 264 (Fla. 1953); Babe's Plumbing, Inc. v. Maier, 194 So.2d 666 (Fla. 2d DCA 1966).
Adaptable argues that the purpose of chapter 713 is to protect owners by placing limits on their liability to lienors. This is indeed one of the purposes of the Mechanics' Lien Act, but the legislature had another purpose in enacting mechanics' lien legislation, i.e., preventing unjust enrichment of owners at the expense of lienors. Florida's Mechanics' Lien Act is an attempt to reconcile these conflicting purposes. Underlying the concept of a mechanics' *1235 lien is the premise that the construction industry needs more protection for extensions of credit than contract remedies provide.[5] This is necessary because, as a rule, those in the construction industry require large amounts of credit for long periods of time and often commit all of their capital to ongoing construction projects.
Florida's first enacted mechanics' lien legislation in 1887 to give materialmen and mechanics, among others, a lien right superior to the rights of others.[6] A provision in the 1885 constitution directing the legislature to draft laws giving mechanics and laborers liens on property which they had improved through supplying materials or services further strengthened this statutory right to a lien.[7] In 1935 Florida became the only state to adopt the Uniform Mechanics' Lien Act.[8] One of the primary purposes in adopting the act was to protect lienors by ensuring that all funds possible were made available to pay off liens.[9] The legislature repealed the act in 1963, but preserved its approach in the revised Mechanics' Lien Act of 1963.
The history of Florida's mechanics' lien statute demonstrates that an important basic purpose of the act is to protect the materialman who uses his material to add value to the property of another and who is not paid for his contribution. This right to a lien is predicated upon performance, not upon contract. To deny Florida Steel recovery would thwart one of the fundamental purposes underlying the statute. During February, March, and April of 1981, Florida Steel delivered steel to the job site pursuant to its contract with Logan and Clark. At the same time that Florida Steel was faithfully delivering the steel, Adaptable had decided that Logan and Clark had breached its contract, mainly because of its failure to provide a performance bond. In March Adaptable stopped making payments to Logan and Clark and began looking for a replacement contractor. Neither Adaptable nor Logan and Clark informed Florida Steel of these developments although both knew that Florida Steel was still making deliveries to the job site.
Subsections 713.06(d)(3)6 and 713.06(3)(e) provide that upon abandonment of a project before completion the owner should determine the amount due each lienor who has given notice and pay or prorate that amount. The section does not define what constitutes abandonment. It does not state any time period from which abandonment can be inferred nor does it state whether or not the owner-contractor must communicate his plans for the project to any interested party.
Construction on the instant building stopped for eight months. Adaptable never told Florida Steel it intended to complete the project. In Alton Towers the owner continued the project immediately after the first contractor abandoned it. Because the instant project remained dormant for so long, the costs of completing the project were higher than they would have been if the construction had been resumed immediately because the cost of completion included the costs of reactivating a long dormant work site. To extend Alton Towers to a situation such as this would leave materialmen subject to the whims of owners. We *1236 cannot make a rule which would allow an owner to take advantage of an abandonment which he has permitted to extend for such a lengthy period of time. Under such a rule an owner could, for example, close down when condominium sales were slow and start up again when sales improved, thereby forcing the lienor to bear the burden of the shutdown because the owner would not have to concern himself with any fluctuations in the cost of labor or materials. Innocent lienors who have faithfully performed and then properly perfected their liens should not be subjected to such risks.
As a practical matter, owners are generally better able to protect themselves than materialmen. They can distribute risks by requiring a bond from the contractor conditioned on the full faith and performance of all lien claims. It is not possible for subcontractors and materialmen to spread risks the way an ordinary merchant does. As we have noted, in the building trades considerable labor and material go into a single operation, generally for an extended period of time. As a result, materialmen and subcontractors cannot take on numerous projects because of the amount of capital tied up in each project. Because of the vulnerable position materialmen are in and because of the importance of their survival to the construction industry, we cannot make a rule which would allow them to be taken advantage of by irresponsible owners or contractors.
We now address the issue of whether the trial court erred in denying Florida Steel prejudgment interest. This issue is controlled by our decision in Argonaut Insurance Co. v. May Plumbing Co., 474 So.2d 212 (Fla. 1985), wherein we reaffirmed the established general rule in Florida that prejudgment interest is merely another element of pecuniary damages, id. at 214, and held: "Plaintiff is to be made whole from the date of the loss once a finder of fact has determined the amount of damages and defendant's liability therefor." Id. at 215.
Adaptable, however, contends that an owner is not liable for prejudgment interest when the owner has a "litigable position upon which to deny liability," and directs our attention to Gerber Groves, Inc. v. Belle Glade Agricultural Contractors, Inc., 212 So.2d 669 (Fla. 2d DCA 1968).[10] We rejected such a contention in Argonaut, wherein we stated that "neither the merit of the defense nor the certainty of the amount of loss affects the award of prejudgment interest." 474 So.2d at 215.
Adaptable further contends that in the absence of contractual privity, an owner will not be liable for prejudgment interest, and directs our attention to a line of cases so holding. We note, however, that the rule requiring privity has not been universally adhered to, see, e.g., Combs v. St. Joe Papermakers Federal Credit Union, 383 So.2d 298 (Fla. 1st DCA 1980), and we now explicitly hold that lack of contractual privity is irrelevant in determining entitlement to prejudgment interest. Again, our decision in Argonaut is controlling, wherein we reaffirmed that the loss theory of prejudgment interest is the law in Florida. Under the loss theory, the plaintiff's loss of the use of funds due him is itself a wrongful deprivation by the defendant of the plaintiff's property. As interest is merely another element of pecuniary damages, once it has been determined that a defendant is liable for a plaintiff's damages, interest should follow as a matter of law. 474 So.2d at 215.[11]
In conclusion, section 713.06(1) provides that a materialman has a lien for any money *1237 that is owed to him. Although the statute does not explicitly provide for pre-judgment interest, Argonaut reaffirmed the rule in Florida that interest is merely another element of pecuniary damages. In Parker v. Brinson Construction Co., 78 So.2d 873 (Fla. 1955), we had occasion to decide whether prejudgment interest was allowable in cases involving workers' compensation claims. Although that statute did not expressly provide for prejudgment interest, we reasoned:
Inherent in the act itself is the intention that if such an award is wrongfully withheld (and under the law it is wrongfully withheld if it be eventually determined that it should have been paid), the person or the party which should have paid it should be compelled to pay, as damages for its detention, lawful interest thereon from the date it should have been paid ...
78 So.2d at 875. This same reasoning applies with equal force to the case sub judice. The trial court below determined, and we have agreed, that Adaptable was liable to Florida Steel for the amount of Florida Steel's lien. Once this determination was made, Florida Steel was entitled, as a matter of law, to prejudgment interest at the statutory rate from the date of that loss, and it was, therefore, error for the trial court to hold otherwise.
Accordingly, we answer the certified question in the negative, quash the opinion of the district court below, and remand for proceedings consistent with this opinion.
It is so ordered.
ADKINS, BOYD, EHRLICH and SHAW, JJ., concur.
McDONALD, C.J., concurs in part and dissents in part with an opinion, in which OVERTON, J., concurs.
OVERTON, J., concurs in part and dissents in part with an opinion.
McDONALD, Chief Justice, concurring in part and dissenting in part.
I concur in the majority opinion to the extent that Florida Steel has a valid lien on the principal. I dissent to that point of the opinion which also gives Florida Steel a lien for the interest.
OVERTON, J., concurs.
OVERTON, Justice, concurring in part and dissenting in part.
I concur with Chief Justice McDonald's concurring and dissenting opinion. I find the majority decision adversely affects junior lienholders with a statutory construction not intended by the legislature.
This lien proceeding is a statutory action, and, as acknowledged by the majority, the statute does not expressly provide for pre-judgment interest. This statute should not be construed to provide inherently for pre-judgment interest. That holding might be proper if the subject statute was directed only to the person or owner who had wrongfully withheld the funds, consistent with our construction in Parker v. Brinson Construction Co., 78 So.2d 873 (Fla. 1955). Chapter 713, however, is designed to protect all lienholders rather than just a recovery method for one lienholder. I find that the legislature did not intend to provide pre-judgment interest for superior lienholders and thereby reduce the amount of recovery of junior lienholders. If junior lienholders are to be so affected under this chapter, it should be by explicit legislative action and not by this Court's inferential construction.
NOTES
[1] § 713.06(2)(a) provides in part: "All lienors under this section, except laborers, as a prerequisite to perfecting a lien under this chapter and recording a claim of lien, shall be required to serve a notice on the owner... ."
[2] § 713.13, Fla. Stat. (1981), requires an owner to record a notice of commencement in the county where the realty which is improved or to be improved is located. It is important that the owner file the notice, especially if the improvements involve subcontractors and laborers not in privity with the owner.
[3] Under § 713.06 the total amount of liens of persons not in privity with the owner is limited by the total contract price of the direct contract if the owner follows the procedures mandated in the statutes.
[4] § 713.07(4) states:

If construction ceases before completion and the owner desires to recommence construction, he may pay all lienors in full or pro rata in accordance with s. 713.06(4) prior to recommencement in which event all liens for the recommenced construction shall take priority from such recommencement; or the owner may record an affidavit in the clerk's office stating his intention to recommence construction and that all lienors giving notice have been paid in full... . Before recommencing, the owner shall record and post a notice of commencement for the recommenced construction, as provided in s. 713.13.
[5] Dawson, The Self-serving Intermeddler, 87 Harv.L.Rev. 1409, 1451 (1974). Modern mechanics' lien statutes give subcontractors and materialmen security which, "they did not contract for and probably could not have contracted for where they had not dealt directly with the owner." Id. at 1453.
[6] Ch. 3747, Laws of Fla. (1887), codified as §§ 1726 et seq., Fla.Rev.Stat. (1892). The title of the bill read "An Act to Protect Mechanics, Artisans, Laborers and Material Men, and to Provide for the Speedy Collection of Moneys due them for Wages or Materials Furnished."
[7] Art. XVI, § 22, Fla. Const. (1885), stated: "The Legislature shall provide for giving to mechanics and laborers an adequate lien on the subject matter of their labor."
[8] Ch. 17097, Laws of Fla. (1935), codified as § 5396, Fla. Stat. (Supp. 1936), later transferred to ch. 84, Fla. Stat.
[9] The act was drafted in 1925 as the Standard Mechanics Lien Act by the committee of the Department of Commerce. It was approved by the American Bar Association in 1932. The act was eventually withdrawn in 1943 after Florida was the only state to adopt it.
[10] Gerber Groves involved a claim of an equitable lien, not a mechanics' lien as is involved here. 212 So.2d at 670. The distinction between these two types of liens was discussed in detail by this Court in Crane Co. v. Fine, 221 So.2d 145 (Fla. 1969).
[11] Also, we rejected in Argonaut the penalty theory of prejudgment interest. According to this theory, interest is awarded to punish a defendant's wrongful act of disputing an award which is found to be just and owing. Under this rejected theory, the merits of the defense determined entitlement to prejudgment interest. 474 So.2d at 214-15. It appears to us that using privity of contract as the determinative factor is based on the premise that it is unfair to "punish" a defendant, who is under no contractual obligations to the plaintiff, by making the defendant pay interest.