**FEDERAL INSURANCE COMPANY a/s/o AAA Mid–Atlantic, Inc., Plaintiff,**

**v.**

**AMERICAN HOME ASSURANCE COMPANY et al., Defendants.**

**No. 07 Civ. 6422(VM).**

United States District Court, S.D. New York.

Oct. 13, 2009.

---

Judith Feinberg Goodman, Thomas Joseph Cirone, Goodman & Jacobs LLP, New York, NY, Steven David Usdin, Barrasso, Usdin, Kepperman, Freeman & Sarver, LLC, New Orleans, LA, for Plaintiff.

Lisa C. Wood, Michael Herbert Cohen, Saiber, L.L.C., Florham Park, NJ, for Defendants.

## DECISION AND ORDER

VICTOR MARRERO, District Judge.

Plaintiff Federal Insurance Company ("Federal") a/s/o AAA Mid–Atlantic, Inc. ("AAAMA") brought this action in New York Supreme Court, New York County, against defendants American Home Assurance Company ("AHA") and National Union Fire Insurance Company of Pittsburgh, PA ("NUIC") (collectively "Defendants"), seeking a declaratory judgment and ancillary relief relating to the obligations of the parties to defend and indemnify AAAMA in an underlying personal injury action (the "Action"). Defendants removed the action to this Court, invoking the Court's diversity jurisdiction pursuant to 28 U.S.C. § 1441 and 28 U.S.C. § 1332(a). Federal now moves for summary judgment under Federal Rule of Civil Procedure 56 ("Rule 56") arguing that AAAMA is insured under policies issued to American Automobile Association, Inc. ("AAA") by AHA and NUIC, and seeking reimbursement for $25 million of the $26.5 million it paid to settle the Action. Defendants also move for summary judgment, argu-

ing that they do not insure AAAMA with respect to the liability arising from the Action, and alternatively, if they do insure AAAMA, they are obligated to pay, according to the principles of equitable contribution, only half of the $25 million Federal seeks. For the reasons stated below, Federal's motion is GRANTED in part and DENIED in part and Defendants' motion is GRANTED in part and DENIED in part.

## I. BACKGROUND[1]

### A. AAA'S RELATIONSHIP TO THE INDIVIDUAL MEMBER CLUBS

AAA is an affiliation of independently operated automobile clubs ("Member Clubs"), including AAAMA. AAA's activities include maintaining "a strong federation of not-for-profit Member Clubs organized to achieve the objects and purposes of [AAA] in assigned service territories." (Dfts.' 56.1 ¶ 23.) These objects and purposes, as stated by AAA's Certificate of Incorporation and Bylaws (the "Certificate" and the "Bylaws", respectively), include "serv[ing] the personal and motoring needs of individual Member Clubs." (Pl.'s 56.1 ¶ 50.)

Each Member Club operates in an assigned service area as an independent and sovereign entity chartered under the laws of the state in which it operates. AAA does not own or operate the Member Clubs; does not issue memberships to the public; does not directly receive revenue from members; and does not contract with the towing companies that provide emergency road service.

Individuals who are members of any Member Club can obtain emergency roadside service anywhere in the United States by calling 1-800-AAA-HELP, the number listed on the AAA membership card distributed to all members. When a member is serviced by a Member Club to which he does not belong, the foreign Member Club is reimbursed by the home Member Club. AAA coordinates payment through a reciprocal clearing bureau that allocates charges among the Member Clubs.

Member Clubs must go through AAA's accreditation process, which includes an inspection to verify that the procedures, services rendered, documents, and appearance of the Member Club are in compliance with AAA's standards. Each Member Club must be accredited at least once every five years, and Member Clubs must submit their audited financial statements on an annual basis.

One element of AAA's accreditation process is an evaluation of the automotive services rendered by the Member Club, and emergency roadside services are emphasized within that evaluation. Once accredited, AAA monitors individual Member Clubs' emergency roadside services based on response times and requiring certain member satisfaction scores on the emergency roadside Member Satisfaction Survey.

Pursuant to its Bylaws, AAA has the right to assign service areas to Member Clubs; approve activities to be undertaken by Member Clubs; make, publish, amend and enforce rules and regulations defining

1. The factual summary that follows derives primarily from the following documents, and any exhibits or declarations submitted therewith: Plaintiff's Complaint, dated June 14, 2007; AHA's Amended Answer and Affirmative Defenses, dated January 30, 2009; NUIC's Amended Answer and Affirmative Defenses, dated January 30, 2009; Plaintiff's Statement Pursuant to Local Civil Rule 56.1, dated April 3, 2009 ("Pl.'s 56.1"); Defendants' Statement Pursuant to Local Civil Rule 56.1, undated ("Dfts.' 56.1"); Plaintiff's Response to Dfts.' 56.1, dated May 21, 2009; and Defendants' Response to Pl.'s 56.1, dated May 22, 2009. Except where specifically referenced, no further citation to these sources will be made.

Member Club services to assure their uniform availability to motorists throughout the United States and Canada; and censure, expel, or revoke the accreditation of any Member Club that violates the By-laws, quality standards, or any of AAA's rules and regulations.

## B. *THE UNDERLYING PERSONAL INJURY CLAIM*

On September 6, 2001, on Route 1 South in Woodbridge, New Jersey, a tow truck operated by Gerard M. Taber ("Taber") collided with a stalled vehicle operated by Richard Douglas Cannon ("Cannon"), causing Cannon serious permanent injury. Taber's employer and the owner of the truck, E & D Auto Repair Towing ("E & D"), was an AAAMA Preferred Service Provider ("Provider"). As an AAAMA Provider, E & D was contractually obligated to provide roadside assistance to AAA Members, and in return was authorized to display the AAA insignia and emblem. At the time of the accident, Taber was responding to a roadside assistance call originating from the 1–800–AAA–HELP line.[2] Taber testified that he became distracted by the digital data system in the truck, heard honking and looked behind the truck to check for loose chains, and then glanced at a woman in a nearby vehicle before slamming into the rear of Cannon's vehicle.

Cannon filed an action for damages in Superior Court of the State of New Jersey, County of Middlesex, entitled *Richard Douglas Cannon v. E & D Auto Repair Towing et al.,* No. MID–L–677–02, against

Taber, E & D, AAAMA, and AAA, among other defendants.[3] Before the close of trial, AAAMA and Cannon agreed to settle for $27.25 million, with Federal contributing $26.5 million, its policy limit, and AAAMA's excess insurer, Fireman's Fund, contributing $750,000.

Despite the settlement, *Cannon* was tried to a verdict. The jury awarded Cannon $12 million and found E & D 85% liable, AAAMA 14% liable, and Cannon 1% liable. Additionally, the jury found that E & D and Taber were agents of AAAMA, and that AAAMA was the agent of AAA.

## C. *THE INSURANCE POLICIES*

Federal issued three policies insuring AAAMA for the relevant time period, including a primary policy with a limit of $1 million for each occurrence (the "Federal Primary Policy"); an umbrella policy with a limit of $25 million (the "Federal Umbrella Policy"), and a business auto policy with a limit of $500,000 per accident (the "Federal Business Auto Policy").

AHA issued a primary commercial general liability policy with a limit of $1 million per occurrence (the "AHA Policy") to AAA, insuring AAA for the relevant time period. The AHA Policy contained an endorsement numbered CL 261 (the "AHA Endorsement") naming Member Clubs as additional insureds under the AHA Policy, "but only with respect to liability arising out of [AAA] operations or premises owned by [AAA]." (Pl.'s 56.1 ¶ 19.)

NUIC issued a commercial liability policy with a limit of $25 million that covered

---

**2.** Defendants assert that there is no evidence that Taber was responding to a 1–800–AAA–HELP call. However, Federal directs the Court to the personal injury trial testimony of AAA's Director of Wireless Communication, Frederick Lorenz, in which he acknowledges that the call was placed to the 1–800–AAA–HELP line. No contradictory evidence was presented during the Cannon personal injury

trial, and no contradictory evidence has been presented to this Court.

**3.** Cannon also named AAA Central–West Jersey ("AAACWJ") as a defendant. AAACWJ and AAAMA were two separate Member Clubs that had merged prior to the Cannon accident. Unless otherwise specified, the Court refers only to the surviving corporation, AAAMA.

AAA during the relevant time period (the "NUIC Policy"). Neither party disputes that the NUIC Policy provides coverage for the Member Clubs to the extent that Member Clubs qualify as insureds under the AHA Policy.

In April 2007, AAAMA and Federal first tendered demands for insurance coverage under the AHA Policy and the NUIC Policy. On May 8, 2007, Defendants disclaimed coverage under both policies. Federal filed the state court action on June 16, 2007.

## II. *DISCUSSION*

### A. *LEGAL STANDARD*

In connection with a Rule 56 motion, "[s]ummary judgment is proper if, viewing all the facts of the record in a light most favorable to the non-moving party, no genuine issue of material fact remains for adjudication." *Samuels v. Mockry*, 77 F.3d 34, 35 (2d Cir.1996) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The role of a court in ruling on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986). The moving party bears the burden of proving that no genuine issue of material fact exists or that, due to the paucity of evidence presented by the non-movant, no rational jury could find in favor of the non-moving party. *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1223–24 (2d Cir.1994).

### B. *CHOICE OF LAW*

■■■ Because this Court is sitting in diversity, it will use the choice of law rules of its forum state, New York, to determine the applicable law. *See Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99, 108–09, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). When addressing a conflict of contract laws, New York courts first identify the contract's "center of gravity" or "grouping of contacts," *see Maryland Cas. Co. v. Continental Cas. Co.*, 332 F.3d 145, 151 (2d Cir. 2003) (*citing Auten v. Auten*, 308 N.Y. 155, 124 N.E.2d 99, 101–02 (1954)), and then apply "the law of the place which has the most significant contacts with the matter in dispute." *Id.* When considering insurance contracts in this analysis, New York courts consider: "the location of the insured risk; the insured's principal place of business; where the policy was issued and delivered; the location of the broker or agent placing the policy; where the premiums were paid; and [the] insurer's place of business." *Olin Corp. v. Insurance Co. of N. Am.*, 743 F.Supp. 1044, 1049 (S.D.N.Y. 1990), *aff'd*, 929 F.2d 62 (2d Cir.1991). To determine whether Defendants' policies cover AAAMA, and thus whether Defendants are required to contribute to the settlement, the Court must interpret the AHA Policy issued to AAA.[4] AAA, the

---

4. Defendants argue Chat to decide these motions the Court must also interpret Federal's policies, which were negotiated and issued in Pennsylvania. Although the Court must compare the Federal policies with Defendants' policies to determine the amount of contribution, whether Defendants must contribute at all is governed solely by the AHA Policy. Further, the Court must look to the Federal Umbrella Policy only to evaluate its "other insurance" clause, and Pennsylvania and Florida law governing the interpretation of "other insurance" clauses do not differ in any way material to the outcome of these motions. *See Allstate Ins. Co. v. Executive Car & Truck Leasing, Inc.*, 494 So.2d 487, 489 (Fla.1986) ("The 'other insurance' clauses in the respective policies cancel each other out, which results in our apportioning the policies on a pro-rata basis determined by the policy limits in relation to the loss."); *accord American Cas. Co. of Reading, Pa. v. PHICO Ins. Co.*, 549 Pa. 682, 702 A.2d 1050, 1054 (1997)

named insured, is headquartered in Florida, and the AHA Policy was issued to AAA in Florida. Thus, Florida law should be used to interpret the AHA Policy. *See American Home Assurance Co. v. Merck & Co., Inc.*, 329 F.Supp.2d 436, 443–45 (S.D.N.Y.2004) (applying Pennsylvania law where insurance policy located itself in Pennsylvania "[g]iven the significance accorded to place of contract by New York's choice of law rules, and the absence of a specific geographical focus for the coverage itself").

■■ The parties point out that absent an actual conflict, the Court is free to apply New York law. *See In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 597 N.Y.S.2d 904, 613 N.E.2d 936, 937 (N.Y. 1993). Laws are in conflict "where the applicable law from each jurisdiction provides different substantive rules." *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998). Federal argues that the only possible conflict between Florida and New York is with respect to insurance policy notice requirements, which Federal suggests will not be dispositive here. The Court disagrees.

The Defendants' policies require that the insured give notice to Defendants of the need for coverage "as soon as practicable." (Goodman Declaration, dated April 3, 2009 ("Goodman Decl."), Ex. F at AHG 0151; Ex. G at NVG 0068.) In New York, the failure to comply with a notice provision will relieve an insurer of its duty to indemnify, thus prohibiting Federal from receiving any contribution from Defendants. *See New York v. Blank*, 27 F.3d 783, 794 (2d Cir.1994) ("[A]lthough the duty to provide notice rests primarily upon the insured, a co-insurer hoping to benefit

from the presence of another insurer, must ensure that the notice provisions of the insured policy with the second insurer are complied with."). In Florida, however, failure to comply with a notice provision may be rebutted if the insurer has not been prejudiced. *See Tiedtke v. Fid. & Cas. Co.*, 222 So.2d 206, 209 (1969); *see also Zurich Am. Ins. Co. v. Cutrale Citrus Juices USA, Inc.*, No. 5:00–CV–149–OC–10GRJ, 2002 WL 1433728, at *1–*2 (M.D.Fla. Feb. 11, 2002) ("[L]ate notice raises a rebuttable presumption of prejudice to the insurer that the insured can overcome if it can demonstrate that the insurer was not in fact prejudiced by the delay."). The Court will apply Florida law because each jurisdiction provides substantively different rules.

As a matter of Florida law, Federal can rebut the presumption of prejudice to Defendants. The rationale driving the notice requirement is that insurers should be provided the opportunity to investigate the occurrence, control litigation, and participate in settlement negotiations. None of those rationales apply here because Cannon sued AAA as well as AAAMA, As AAA's insurers, Defendants were able to perform their own investigation of the accident. Defendants' counsel worked with Federal's counsel throughout the litigation, and Defendants' counsel was asked to participate in the settlement. Though Defendants did not receive an official request to defend and indemnify until April 2007, they were fully aware of the matter and were in no way prejudiced by any delay. Having found that Federal satisfies the threshold notice requirement, the Court will proceed to the merits of Federal's claim.

(holding that "other insurance" clauses cancel each other out when they are incompatible, and loss should be divided between the policies by equal shares). As the NUIC Policy and Federal Umbrella Policy both have a limit

of $25 million, and the AHA Policy and Federal Primary Policy both have a limit of $1 million, the apportionment is identical under either states' method of analysis.

## C. EQUITABLE CONTRIBUTION

■ "Under Florida law, when a person pays more than his or her share of an obligation, the law provides that person the remedy of contribution to obtain payment of the other obligors' share of the obligation." *United States Fid. & Guar. Co. v. Liberty Surplus Ins. Co.*, No. 6:06-cv-1180-Orl-31UAM, 2007 WL 3275307, at *2 (M.D.Fla. Oct. 31, 2007) (*citing Desrosiers v. Russell*, 660 So.2d 396, 398 (Fla.2d Dist.Ct.App.1995)). It follows that when two insurers both insure the same risk and one insurer covers the entire loss, the paying insurer may seek contribution from the other, nonpaying insurer. *See, e.g., American Cas. Co. of Reading Pa. v. Health Care Indem., Inc.*, 613 F.Supp.2d 1310, 1320–21 (M.D.Fla.2009) (finding that plaintiff insurer failed to meet its burden of proof for contribution from defendant coinsurer); *Allstate Ins. Co. v. TIG Ins. Co.*, 711 So.2d 84, 85–86 (Fla.1st Dist.Ct.App. 1998) (instructing that coinsurers should "be required to share liability on a prorata basis, determined by the policy limits in relation to the loss").

■ Under Florida law, before an insurer may bring an action for contribution, it needs to obtain "an identifiable agreement, either oral or written, preserving a cause of action ... for either indemnity, contribution and/or equitable subrogation" from its alleged coinsurer. *Lumbermens Mut. Cas. Co. v. Foremost Ins. Co.*, 425 So.2d 1158, 1159–60 (Fla.3d Dist.Ct.App.1983); *see also Evanston Ins. Co. v. Advanced Transp. Solutions, LLC*, 949 So.2d 320, 321 (Fla.3d Dist.Ct.App.2007) (dismissing contribution claim for failure to produce an agreement preserving the cause of action). The agreement need not be formal; it is enough that one insurer demands that the other participate in the settlement of the insured's claim. *See Galen Health Care Inc. v. American Cas. Co. of Reading, Pa.*, 913 F.Supp. 1525, 1531 (M.D.Fla.1996)

(holding that plaintiff insurer reserved its rights by letter demanding coverage from defendant insurer) (*citing Lehman–Eastern Auto Rentals, Inc. v. Brooks*, 370 So.2d 14, 16 (Fla.3d Dist.Ct.App.1979)).

■ Here, Federal paid $26.5 million of the $27.25 million settlement amount to Cannon on behalf of AAAMA. Assuming that the loss is also covered by Defendants, an issue to be discussed below, Federal is entitled to equitable contribution based upon the shared burden. Though neither party discussed Federal's reservation of rights to proceed against Defendants in their briefs, the Court finds that Federal did so through letter dated April 19, 2007. By demanding coverage from Defendants, Federal properly reserved its right to proceed against them in an action for equitable contribution.

## D. COMMON OBLIGATION

■ Once the Court has determined that the cause of action may proceed, the Court must decide whether the insurers share a "common burden" or liability. *Liberty Surplus*, 2007 WL 3275307, at *2 (*quoting Lopez v. Lopez*, 90 So.2d 456, 458 (Fla.1956)). In conducting this inquiry, the Court will consider whether the carriers both insure the same risk. *Id.* at *3. The insurer seeking contribution has the burden of showing that the alleged coinsurer's policy insures the particular loss in dispute. *See Spencer v. Assurance Co. of Am.*, 39 F.3d 1146, 1149 (11th Cir. 1994) ("Florida law clearly states that liability of an insurer depends upon whether the insured's claim is within the coverage of the policy ... even when the insurer has unjustifiably failed to defend its insured in the underlying action."); *Aetna Ins. Co. v. Waco Scaffold & Shoring Co.*, 370 So.2d 1149, 1152 (Fla.4th Dist.Ct.App. 1978) ("[T]he burden of proving the allegations regarding coverage is upon [the par-

ty seeking contribution] and [that party] failed to prove that [the alleged coinsurer's] policies covered the liability upon which the verdict and judgment were founded."). The Court finds that Defendants' policies do cover AAAMA with respect to Cannon's settlement, and therefore, Federal is entitled to contribution.

 The question of multiple coverage turns on the meaning of "arising out of" as used in the AHA Endorsement. Under Florida law, when contract language is unambiguous, its plain meaning should be enforced. *See, e.g., Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So.2d 161, 165 (Fla.2003) ("[I]nsurance contracts must be construed in accordance with the plain language of the policy."). An insurance contract is ambiguous when "the relevant policy language is susceptible to more than one reasonable interpretation." *Auto–Owners Ins. Co. v. Anderson*, 756 So.2d 29, 34 (Fla.2000). "The lack of a definition of an operative term in a policy does not necessarily render the term ambiguous and in need of interpretation by the courts." *State Farm Fire & Cas. Co. v. CTC Dev. Corp.*, 720 So.2d 1072, 1076 (Fla.1998). If the policy language is ambiguous, the Court will construe the language in favor of the insured and against the insurer. *See Auto–Owners*, 756 So.2d at 34.

 The AHA Policy insures AAAMA "but only with respect to liability arising out of [AAA's] operations." (Pl.'s 56.1 ¶ 19.) The AHA Policy does not define the phrase "arising out of." In insurance policies, Florida courts construe the phrase "arising out of" broadly to mean "originating from, having its origin in, growing out of, flowing from, incident to or having a connection with." *Taurus Holdings, Inc. v. United States Fid. and Guar. Co.*, 913 So.2d 528, 539 (Fla.2005) (internal citation and quotation marks omitted). The Florida Supreme Court found the phrase unam-

biguous and instructed that it should be interpreted to "require some causal connection, or relationship," but not proximate cause. *Id.* at 540 (internal citation and quotation marks omitted).

Defendants do not dispute that the meaning of "arising out of" is unambiguous. They do, however, assert that AAA's operations are narrow, and do not encompass the emergency roadside service that ultimately caused Cannon's injury. Defendants characterize AAA as an association of independently incorporated and operated entities bound together by the AAA brand and the AAA mission, with each entity responsible for its own individual liabilities. In sum, Defendants argue that the liability arose from AAAMA's, not AAA's, operations.

The record shows, however, that there is no bright dividing line between the operations of AAA and its Member Clubs. AAA's operations depend upon its Member Clubs, and vice versa. Although this close relationship does not necessarily transform all of AAAMA's operations into AAA's operations, the Court finds that AAA's operations include a level of emergency roadside oversight and coordination that is, at the very least, "connected to" the Cannon accident and AAAMA's liability.

In order to ensure the survival of its network, AAA involves itself in the day-to-day operations of each Club, including AAAMA. AAA accredits AAAMA, issues standards for AAAMA to follow, and enforces the standards, reprimanding AAAMA when it fails to meet them. Most importantly, an AAA member can call 1–800–AAA–HELP anywhere in the country and receive emergency roadside assistance twenty-four hours a day, seven days a week. All of the service calls are processed by AAA's reciprocal clearing bureau, which allocates charges among the clubs. In most cases, the member does

not know which AAA Member Club will respond to his or her call, or that there are even different Member Clubs. Each responding tow truck and driver displays the same AAA insignia, aims to arrive within the thirty-minute window set by AAA, and reports estimated times of arrival and actual times of arrival to AAA, all to comply with AAA's automotive quality standards. (*See* Goodman Decl., Ex. K.). The AAA organization is built on the ideal of uniform appearance and service throughout the country and AAA works to preserve this ideal. At the time of the accident, Taber was responding to an AAA member call. The record shows that the member called the AAA nationwide 1–800 number and was then directed to the Member Club, which dispatched E & D. Taber hit Cannon's car on his way to help an AAA member who had called the AAA number. The accident "arises out of" the call to an AAA number, which is serviced by AAA. The accident was "originating from, incident to, or having connection with" the AAA number, an AAA operation.

Defendants' argue that this interpretation of the insurance policy ignores the commercial realities of the relationship between AAA and its Member Clubs. Defendants' assert that AAA never intended to transfer the risk of negligent tow truck operations to itself, and that AAAMA never expected that AAA would do so. They argue that this risk transfer would defy common sense. The Court takes no position on the wisdom of the insurance policy. Given the unambiguous language of the contract and the broad, generally accepted, interpretation of "arising out of," the Court must look to the language of the four corners of the contract. If the parties had intended to limit their coverage, they could have contracted to do so, but the Court will not rewrite the unambiguous language of the contract.

■ Defendants also argue that it is unclear what portion of the settlement may be attributed to AAAMA's liability in the Cannon accident, and that if Defendants must contribute to the settlement, they should be responsible for contributing only the amount "arising out of" AAA's operations. Defendants cite to New York cases similar to *Guarantee Insurance Company v. Gulf Insurance Company*, where the court held that when the underlying loss is a judgment against the insured "and that judgment includes elements for which an insurer may be liable as well as elements beyond the coverage of policy, the burden of apportioning the damages is on the party seeking to recover from the insurer." 628 F.Supp. 867, 870 (S.D.Fla.1986), *aff'd*, 811 F.2d 610 (11th Cir.1987). Here, however, Federal entered into a settlement on behalf of AAAMA before the jury awarded judgment. The Release Agreement (the "Release"), dated June 13, 2007, was executed by Cannon for the benefit of AAAMA. No other defendants in the underlying action, including AAA, Taber, or E & D, were parties to the Release. Defendants, relying on the ultimate jury verdict, submit that the settlement amount reflected AAAMA's risk of vicarious liability for Taber and E & D's actions, not AAAMA's own liability. Defendants suggest that contribution should be limited to 14% of the settlement, AAAMA's fault percentage as determined by the jury.

Upon considering the circumstances of settlement, the Court finds this proposed method of contribution unpersuasive. Parties reach a settlement by calculating the risks of an adverse judgment, among other considerations, and the Court cannot know how the parties evaluated their options. Although the jury assigned Taber and E & D the brunt of the fault, it is possible that AAAMA had predicted a different outcome. Any attempt to determine settle-

ment contribution amounts based on actual jury outcome would distort the parties' ex ante assessment of liability.

 Further, Defendants' contribution should not be limited to the settlement amount attributable to AAAMA's direct liability, even if that could be determined. The language of the policy insures AAA-MA "only with respect to liability arising out of [AAA's] operations." The policy does not distinguish between direct and vicarious liability, but provides coverage for any of AAAMA's liability connected to AAA's operations.

Further, as will be discussed more fully below, the carriers seeking contribution provide the same type of coverage as Defendants. The AHA and the Federal general liability policies both provide primary coverage, whereas the NUIC and Federal umbrella policies both provide excess coverage. *See Liberty Surplus,* 2007 WL 3275307, at *3 (explaining that there can be no claim when a primary carrier seeks contribution from an excess carrier, and not another primary carrier).

 Finally, nothing about AAAMA's status as an additional insured precludes it from successfully alleging a contribution claim. *See id.* (finding that insurers of additional insured and named insured may share a "common obligation"). Considering that Defendants do not contest the reasonableness of the settlement made on behalf of AAAMA to settle its liability arising out of AAA's operations, the Court concludes that Federal has met its burden. AAAMA's loss was within the coverage of Defendants' policies. Federal and Defendants shared a common obligation which Federal satisfied, and Defendants owe Federal equitable contribution in return.

### E. *PRIORITY OF COVERAGE*

Having found that AAA's policies insure AAAMA as an additional insured with respect to liability arising out of the Cannon accident, the Court must determine whether Defendants must reimburse Federal for all or a portion of the settlement amount. Under the $27.25 million settlement, the Federal Business Auto policy, a primary policy not at issue here, provided $500,000 of coverage. The Federal Primary Policy paid $1 million. Fireman's Fund, an excess policy not at issue here, contributed $750,000. Finally, the Federal Umbrella Policy paid $25 million.

Federal seeks a $25 million reimbursement from Defendants,[5] arguing that where one insurer defends and settles a lawsuit and another insurer improperly refuses to provide coverage, the nonperforming insurer must reimburse the performing insurer for its reasonable settlement payment. Federal identifies no case law in support of this argument. Further, there has been no determination that Defendants improperly refused to provide coverage, and Federal did not move for summary judgment on the matter of whether Defendants breached their duty to defend. Despite Federal's arguments, the Court will use the traditional standards applied to paying insurers seeking contribution from non-paying insurers.

 In order to determine the appropriate level of contribution, otherwise known as the priority of coverage, the Court must look to the language of the insurance policies. *See Allstate,* 711 So.2d at 86 ("One insurance company may not attempt to rewrite the policy of another insurance company."); *Sentry Ins. Co. v. Aetna Ins. Co.,* 450 So.2d 1233, 1236 (Fla.2d Dist.Ct.App.1984) ("In cases where

---

**5.** Federal does not seek reimbursement for the $500,000 paid under the Federal Business

Auto Policy or the $1 million paid under the Federal Primary Policy.

more than one insurer's policy provides coverage for a loss, it is appropriate to review the insurance contracts to see if the documents address the 'ranking' or contribution of other insurers.").

First, courts must determine whether the insurance policy provides for primary coverage or excess coverage. *See St. Paul Fire and Marine Ins. Co. v. Lexington Ins. Co.,* 2006 WL 1295408, at *4. Coverage is primary where "liability attaches immediately upon the happening of the occurrence that gives rise to liability." *Id.* Coverage is excess where "liability attaches only after a predetermined amount of primary coverage has been exhausted." *Id.*

Second, courts identify the policies' "other insurance" clauses, which may include the "(1) pro rata or proportionate recovery clause; (2) excess insurance clause; [or] (3) escape or no liability clause." *Sentry Ins. Co.,* 450 So.2d at 1236. Through these "other insurance" clauses, insurance companies attempt to limit their contribution when, such as here, there is multiple coverage. *See St. Paul Fire,* 2006 WL 1295408, at *4. If the "other insurance" clauses are compatible, the Court will enforce the clauses by their terms. *See Twin City Fire Ins. Co. v. Fireman's Fund Ins. Co.,* 386 F.Supp.2d 1272, 1278 (S.D.Fla.2005). However, often policies have very similar "other insurance" provisions, meaning that it is impossible for more than one provision to be enforced simultaneously. In those situations, the functionally identical provisions cancel each other out. *See Allstate Ins. Co. v. Executive Car & Truck Leasing, Inc.,* 494 So.2d 487, 489 (Fla.1986). This is known as "the rule of mutual repugnancy." *Twin City Fire,* 386 F.Supp.2d at 1278 (internal quotations omitted). "Therefore, instead of attempting to reconcile two incompatible provisions, courts in such situations will disregard both provisions and prorate the loss." *Id.*

1. *AHA Policy Must Contribute $1 Million for its Share of the Loss*

The Federal Primary Policy and the AHA Policy both state that they are primary policies. (*See* Goodman Decl., Ex. F. AHG 0151; Ex. H at FCP0351–52.) As a primary policy, the AHA Policy should have been exhausted to its limits—$1 million—before Federal's Umbrella Policy applied to the loss. Defendants do not dispute that any primary coverage obligation found by the Court would be shared by the AHA Policy with the Federal Primary Policy. AHA must therefore reimburse Federal $1 million.

2. *NUIC Must Contribute $12 Million for its Share of the Loss*

Both the NUIC Policy and Federal Umbrella Policy indicate that they are to be considered excess over any other applicable policies. As explained above, "where a court must allocate between two policies at the same level that contain incompatible excess clauses, the majority rule is that the two excess clauses cancel each other out, and the loss is pro-rated between the two policies." *Twin City Fire,* 386 F.Supp.2d at 1279. Federal argues that the two excess clauses are not incompatible, and may be read together. The Federal Umbrella Policy and the NUIC Policy include the following "other insurance" provisions:

*NUIC*

If other valid and collectible insurance applies to a loss that is also covered by this policy, this policy will apply excess of the other insurance. However, this provision will not apply if the other insurance is specifically written to be excess of this policy.

*Federal Umbrella*

If other insurance applies to claims covered by this policy, the insurance under this policy is excess and we will not make any payments until the other insurance has been exhausted by payment of claims. This insurance is not subject to the terms and conditions of any other insurance.

(Defts.' 56.1 ¶¶ 48, 59.)

Federal argues that the phrase "will not make any payments until ..." makes its policy excess, not identical, to Defendants' policy. Federal relies on *Aetna Casualty & Surety Co. v. Beane*, in which a Florida court found that the phrase "shall not contribute with ..." made the policy excess to a policy that stated it would be "excess insurance over any other valid and collectible insurance." 385 So.2d 1087, 1090 (Fla.4th Dist.Ct.App.1980). As Defendants point out, in *Beane*, the court differentiated between an excess policy and what was actually a primary policy. The Federal Umbrella Policy and the NUIC Policy, on the other hand, are both styled as excess policies. They are both written to provide coverage beyond primary business auto and general liability policies, and although their precise language varies, the Court finds that they are incompatible. To give effect to Federal's "other insurance" clause would be to ignore NUIC's, and "[o]ne insurance company may not attempt to rewrite the policy of another insurance company." *See Allstate*, 711 So.2d at 86. According to Florida law, the mutually repugnant clauses drop out, and each policy must share equally the remainder of the settlement amount. After the primary insurers contribute $2.5 million and the other excess policy not at issue here contributes $750,000, the remaining settlement amount is $24 million. Therefore, NUIC must reimburse Federal $12 million.

## F. *PREJUDGMENT INTEREST*

■ Federal argues that it is entitled to an award of prejudgment interest as of right. Defendants, on the other hand, assert that any judgment for Federal will be based in equity, not contract, and it is within the Court's discretion whether to award prejudgment interest. The Court holds that Federal is entitled to recover prejudgment interest, per Florida's statutory rate of interest, accruing from the date of settlement, June 13, 2007.

■ Florida follows the "loss theory" of awarding prejudgment interest. "Under the loss theory, the plaintiff's loss of the use of funds due him is itself a wrongful deprivation by the defendant of the plaintiff's property." *Florida Steel Corp. v. Adaptable Devs., Inc.*, 503 So.2d 1232, 1236 (Fla.1986). Once it has been determined that a defendant is liable, prejudgment interest "should follow as a matter of law." *Id.* Under Florida law, "[t]here are two prerequisites to an award of prejudgment interest: (1) out-of-pocket pecuniary loss; and (2) a fixed date of that loss." *H & S Corp. v. United States Fid. & Guar. Corp.*, 667 So.2d 393, 399 (Fla.1st Dist.Ct.App.1995). There is no requirement that the two parties be in privity of contract. *See Fla. Steel*, 503 So.2d at 1236. Here, Federal has suffered an out-of-pocket loss. Federal paid the entire sum of the settlement, a portion of which Defendants were obligated to pay, and the date of loss is fixed at the date of settlement, June 13, 2007. Therefore, Federal is entitled to prejudgment interest from June 13, 2007 at the statutory rate. *See* Fla. Stat. § 55.03.

## III. *ORDER*

For the reasons discussed above, it is hereby

412

ORDERED that the motion (Docket No. 47) of Federal Insurance Company ("Federal") for summary judgment is GRANTED in part and DENIED in part; it is further

ORDERED that the motion (Docket No. 52) of American Home Assurance Company ("AHA") and National Union Fire Insurance Company of Pittsburgh, PA ("NUIC") for summary judgment is GRANTED in part and DENIED in part; it is further

ORDERED that AHA pay Federal $1 million plus prejudgment interest from June 13, 2007, at the rate set by Florida statute; it is further

ORDERED that NUIC pay Federal $12 million plus prejudgment interest from June 13, 2007, at the rate set by Florida statute; and it is further

ORDERED that the Clerk of the Court is directed to enter judgment accordingly, withdraw any pending motions, and close this case.

SO ORDERED.