[769 NYS2d 234]

GREATER NEW YORK MUTUAL INSURANCE COMPANY, Respondent,
v MUTUAL MARINE OFFICE, INC., Appellant.

First Department, December 16, 2003

**APPEARANCES OF COUNSEL**

*Richard C. Rubinstein* and *Thomas D. Hughes* for respondent.

*Brown Gavalas & Fromm LLP (Timothy G. Hourican* and *Michael P. Naughton* of counsel), for appellant.

**OPINION OF THE COURT**

Sullivan, J.

At issue is an insurance coverage dispute between plaintiff Greater New York Mutual Insurance Company (GNY) and defendant Mutual Marine Office, Inc. (MMO) arising out of the January 15, 1999 collapse of the roof of a building housing a commercial parking garage located in the premises at 241 East Broadway, as a result of which a number of cars parked at the garage were destroyed or damaged. Numerous claims were thereafter filed against the owner of the building, Seward Park Housing Corp. (Seward) and its lessee, Ulltra East Parking Corp. (Ulltra), the operator of the parking garage, for the recovery of the value of the cars destroyed or the cost of repair of those damaged in the collapse.

On or about August 21, 1990, Seward, a real estate cooperative apartment corporation, and Ulltra entered into a 10-year lease of the "entire garage building, including roof, as presently constructed," which was to be used "solely and exclusively as a 24 hour garage for the storage of motor vehicles." Ulltra, at its own cost and expense, was to "keep the demised premises clean and well lit, fix broken windows and keep all doors and gates (including overhead doors) . . . operating and in good repair, paint and restripe the demised premises when necessary, keep the surfaces of walls, floors and ceiling in good repair and free of leaks . . . and make all other necessary repairs to the demised premises, including all repairs required to safely and legally operate the Garage and repairs to mechanical systems, except that the Tenant shall not make any structural repairs not expressly referred to herein." Thus, Seward was solely responsible for repairs to the structure of the parking garage.

The lease also required Ulltra to provide liability insurance coverage for itself and Seward with respect to Ulltra's leasing of the parking garage. The insurance procurement clause states:

*"Insurance.* (a) Tenant at its own cost and expense, shall procure and at all times maintain general liability insurance with companies satisfactory to Landlord, insuring Landlord and Tenant against damages from bodily injury, including death, and for injury to property to any and all persons, incurred either in the interior of the demised premises, or any part thereof, or upon and in or about adjacent to the exterior of the said premises."

In compliance with this requirement, Ulltra procured a comprehensive general liability policy with a garage keepers liability endorsement (No. 3) from MMO for bodily injury and property damage with an additional insured endorsement for the period January 31, 1998 to January 31, 1999 that included coverage for damage to cars "in connection with the insured's [Ulltra's] 'garage operations.'". Endorsement No. 3 defined "Garage Operations" as "the ownership, maintenance or use of locations for the purpose of a business of selling, servicing, repairing or parking 'automobiles' and that portion of the roads or other accesses that adjoin these locations."As regards the MMO policy's additional insured provision, endorsement No. 11 specifically provides, "It is agreed that this Policy shall include as additional insureds any person or organization to whom [Ulltra] has agreed by written contract to provide coverage, but only with respect to operations performed by or on behalf of [Ulltra]."

Shortly after the January 15, 1999 collapse of the parking garage roof, claims were asserted, as noted, by the owners of vehicles as well as by the vehicle owners' subrogated insurers against Seward and Ulltra, seeking to recover for the damage to the vehicles parked in the garage at the time of the collapse. At the time, Seward was the named insured under a general liability policy issued by GNY for the period of July 31, 1998 to July 31, 1999 providing commercial property, commercial general liability and commercial automobile coverage for Seward's properties, including 241 East Broadway. The coverage provided by the GNY policy issued to Seward is distinct from the MMO policy and not overlapping, and it covered claims arising out of the ownership of the building. As noted, the MMO policy, on the other hand, provided additional insured coverage for Seward only for claims arising out of Ulltra's parking garage operations.

After reaching agreement with MMO to fund jointly the settlement of claims by the owners of cars uninsured for damage or

loss due to the roof collapse, subject to resolution of ultimate liability after the disposition of all similar claims, GNY, in March 2000, requested coverage from MMO on behalf of Seward as an additional insured for those claims asserted by subrogated insurers whose insureds' cars had been damaged or destroyed in the collapse. MMO disclaimed coverage on the ground that Seward was not an additional insured under the terms of endorsement No. 11 since the claims did not arise out of the "operations performed by or on behalf of [Ulltra]," the named insured. In response, GNY commenced this action seeking a declaration that Seward is entitled to additional insured coverage under the MMO policy. GNY moved for summary judgment for a declaration that MMO was obligated to defend and indemnify Seward with respect to the subrogated claims. MMO cross-moved for summary judgment dismissing the complaint. Supreme Court granted GNY's motion, holding, "Since the automobiles in question were damaged while parked in the garage maintained by Ulltra . . . , the claims against Seward which were filed by the automobile owners and their insurers clearly arose from Ulltra's . . . operations." Thus, the court held, the MMO policy's additional insured endorsement was triggered, obligating MMO to defend and indemnify Seward against the claims arising out of the roof collapse. As is plainly evident, the collapse of the roof had nothing to do with Ulltra's garage operations. Thus, the additional insured endorsement was never triggered and a reversal is in order.

To determine whether Seward is an additional insured under MMO's policy for claims arising out of the collapse of the parking garage roof, it is necessary to look to the policy itself and the underlying lease between Ulltra and Seward (*General Acc. Fire & Life Assur. Corp. v Travelers Ins. Co.*, 162 AD2d 130 [1990]). In that case, a lessee of a marine terminal procured a general liability policy naming the lessor as an additional insured under an endorsement that limited additional insured coverage to liability arising out of the lessee's ownership, maintenance or use of the leased terminal. The Court looked to the obligations undertaken by the tenant in the underlying lease agreement to determine whether the claim asserted implicated those obligations so as to trigger the additional insured endorsement.

The lease agreement between Seward and Ulltra specifically limits the permitted use of the demised premises "solely and exclusively as a 24 hour garage for the storage of motor

vehicles." Moreover, the lease limited Ulltra's duty to repair to cleaning and surface maintenance and keeping the premises in good repair. The lease reserved the obligation of making structural repairs to Seward. In accordance with the policy's terms, endorsement No. 11 qualifies an entity as an additional insured if Ulltra "has agreed by written contract to provide coverage, but only with respect to operations performed by or on behalf" of Ulltra. MMO's policy defines "[g]arage [o]perations" as the "ownership, maintenance or use of locations for the purpose of a business of selling, servicing, repairing or parking 'automobiles' and that portion of the roads or other accesses that adjoin these locations."

Thus, in accordance with the lease terms and policy provisions, Seward would qualify as an additional insured under MMO's policy only as to claims arising out of the "operations performed by or on behalf of" Ulltra, that is, parking garage operations. Any claim of liability on Seward's part arising out of an incident relating to the operation of the parking garage, such as parking or servicing cars or involving nonstructural repair or maintenance of the premises, would necessarily arise out of the operations "performed by or on behalf of Ulltra," thereby triggering the additional insured clause. The collapse of the parking garage roof clearly did not arise out of Ulltra's parking garage operations but, rather, absent a showing otherwise, which GNY has not made, out of a structural defect in the building housing the parking garage, as to which, under the lease, Seward had the duty of repair. As noted, Ulltra's maintenance obligations under the lease were limited to cleaning and surface repair. In considering the provisions of the MMO policy and the terms of the lease, it is clear that the additional insured endorsement was never intended to extend to Seward's liability arising out of a roof defect in a building it owns and which, under its lease with Ulltra, it is obligated to maintain.

In holding that Seward is an additional insured under the MMO policy, Supreme Court relied upon *Tishman Constr. Corp. v CNA Ins. Co.* (236 AD2d 211 [1997]) and *Structure Tone v Component Assembly Sys.* (275 AD2d 603 [2000]), which are distinguishable. Both *Tishman* and *Structure Tone* deal with the interpretation of an additional insured provision in a policy of liability insurance for a subcontractor in the construction field, and not a liability policy for a garage operator. In those cases, the additional insured clause of the subcontractor's policy limited such coverage to "liability arising out of 'your [the

subcontractor's] work' " (*Structure Tone* at 603) and "liability . . . for 'your work' " (*Tishman* at 212 [dissenting mem]) for the putative additional insured.

*Tishman*, which *Structure Tone* followed, adopted the language of *Consolidated Edison Co. v Hartford Ins. Co.* (203 AD2d 83 [1994]) that the additional insured language at issue "focuses not upon the precise cause of the accident . . . but upon the general nature of the operation in the course of which the injury was sustained" (*id.* at 83). In the construction field context, the general contractor is held to be an additional insured under the subcontractor's policy where, typically, the injury occurs to an employee of the subcontractor (*see e.g. Tishman, supra*; *Consolidated Edison Co., supra*) or of an entity with which the subcontractor has subcontracted (*see e.g. Structure Tone, supra*). Under such circumstances, the employee is injured in furtherance of the work to be performed under the contract and the injury, arguably, arises out of the subcontractor's operations at the work site.

This distinction is exemplified by *Consolidated Edison Co.*, where the subcontractor's policy contained an additional insured endorsement, which stated: "The 'Persons Insured' provision is amended to include as an insured [Con Edison] but only with respect to liability arising out of operations performed for such insured by or on behalf of the named insured [the contractor]." (203 AD2d at 83.) The subcontractor's employee was injured while removing debris and other material accumulated from insulation work required under the contractor's contract with Con Edison. Thus, the injury arose out of the operations performed by or on behalf of the insured, the contractor, in furtherance of the work to be performed under the contract.

Given the significantly different relationship between owner/ general contractor and lessor/lessee garage keeper, the rationale for extending additional insured coverage to an owner does not apply to the additional insured endorsement in a comprehensive general liability policy with a garage keepers liability endorsement. A construction contractor, working in furtherance of its contract with the owner, is in the best position to avoid or reduce the risk of injury, especially to its own employees and those of its subcontractor. In fact, often, as in *Consolidated Edison Co.* (*supra*), the contractor is required to procure liability insurance coverage to protect the owner against liability for work being performed at the construction site by it or in its behalf. In such circumstances, as the courts recognize (*see Kinney v Lisk Co.*,

76 NY2d 215 [1990]; *Mathew v Crow Constr. Co.*, 220 AD2d 490 [1995]), it is appropriate, as a matter of risk allocation, to shift the risk of liability, as the case may be, to the contractor or subcontractor performing the work giving rise to the liability.

Such considerations do not apply to the relationship of a lessee garage keeper to the lessor, especially in light of the lease allocation of responsibility for the repair and maintenance of the demised premises. Here, the lease specifically reserves to Seward the sole responsibility for structural repairs. Unlike the contractor or subcontractor, which has the opportunity to control or minimize the risk of injury to its employees and those acting in its behalf at a construction site, Ulltra was in no position to avoid the risk of the structural collapse of the roof of a garage it leased, an event completely beyond its control.

In determining the scope of contractual obligations, the reasonable expectation of the parties is a factor to be considered. Indeed, "[a]ny interpretation of an insurance contract implicates as a standard 'the reasonable expectation and purpose of the ordinary businessman when making an ordinary business contract' " (*Matter of Midland Ins. Co.*, 269 AD2d 50, 59 [2000], quoting *Atlantic Cement Co. v Fidelity & Cas. Co.*, 91 AD2d 412, 418 [1983], *affd* 63 NY2d 798 [1984]). Thus, courts must interpret a contract so as to give meaning to all its terms. "The reason is clear. Since a contract is a voluntary undertaking, it should be interpreted to give effect to the parties' reasonable expectations" (*Mionis v Bank Julius Baer & Co.*, 301 AD2d 104, 109 [2002]). In that regard, it cannot be seriously argued that in negotiating the lease, Seward and Ulltra, and by extension, MMO, Ulltra's insurance carrier, contemplated that Ulltra would bear the responsibility for damages arising out of the collapse of Seward's garage roof.

Consistent with that apportionment of responsibility, MMO's endorsement No. 11 limited the scope of additional insured coverage to liability arising out of Ulltra's garage operations, which are defined in endorsement No. 3. While it might reasonably be anticipated that an insurer would expect its policy to provide additional insured coverage to a general contractor or owner for injuries sustained by the named insured's employee in a construction site accident, the same cannot be said with respect to a building owner under a comprehensive general liability policy endorsed to provide garage keepers liability coverage for a structural collapse. Since the liability for the damage to the parked cars, at the nub of this coverage issue, arose out

of the structural maintenance of the demised premises, the responsibility for which, under the lease, was reserved to Seward, rather than out of Ulltra's "garage operations," the additional insured endorsement was never triggered.

We have considered the other issues raised and find that they are without merit.

Accordingly, the order of the Supreme Court, New York County (Marylin Diamond, J.), entered April 12, 2002, which, in this declaratory judgment action, upon the parties' respective motions for summary judgment, granted plaintiff's motion and declared in its favor, and denied defendant's cross motion, should be reversed, on the law, with costs and disbursements, plaintiff's motion denied, defendant's cross motion granted and a declaration made that defendant has no obligation to defend or indemnify Seward in connection with the underlying claims.

NARDELLI, J.P., SAXE and WILLIAMS, JJ., concur.

Order, Supreme Court, New York County, entered April 12, 2002, reversed, on the law, with costs and disbursements, plaintiff's motion denied, defendant's cross motion granted and a declaration made that defendant has no obligation to defend or indemnify the owner of the building in connection with the underlying claims.