Federal Insurance Company v. American Home Assurance Company

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term 2010

Docket Nos. 09-4779-cv (L), 09-4842-cv (XAP)

Argued:  October 26, 2010                    Decided: April 7, 2011

_____

FEDERAL INSURANCE COMPANY, as subrogee of AAA Mid-Atlantic, Inc.,

*Plaintiff-Appellant-Cross-Appellee*,

- v.-

AMERICAN HOME ASSURANCE COMPANY, NATIONAL UNION FIRE
INSURANCE COMPANY OF PITTSBURGH, PA,

*Defendants-Appellees-Cross-Appellants.*[*]

_____

Before:  MINER, KATZMANN, and HALL, <u>Circuit Judges</u>.

Appeal and cross-appeal from a judgment entered October 21, 2009, in the United States District Court for the Southern District of New York (Marrero, <u>J.</u>), granting in part and denying in part the motion for summary judgment made by plaintiff insurance company and granting in part and denying in part the motion for summary judgment made by defendant insurance companies in an action brought by plaintiff as subrogee of a regional affiliate of the American Automobile Association, Inc. ("AAA") against the liability insurers of AAA seeking indemnification for payments made by plaintiff in settlement of a personal injury action, the District Court having determined, <u>inter alia</u>, that liability for the injury arose out of the operations of AAA and that contribution therefore was warranted in accordance with the terms of the policies issued by defendant insurers.

Reversed.

_____

[*] The Clerk of the Court is directed to amend the official caption as set forth above.

JUDITH FEINBERG GOODMAN, Thomas J. Cirone, Goodman & Jacobs, L.L.P., New York, New York, *for* Plaintiff-Appellant-Cross-Appellee.

Lisa C. Wood, Saiber Schlesinger Satz & Goldstein, LLC, Newark, New Jersey, *for* Defendants-Appellees-Cross-Appellants.

BARBARA I. MICHAELIDES, Paula M. Carstensen, Agelo Reppas, Bates & Carey L.L.P., Chicago, Illinois, *for* Defendants-Appellees-Cross-Appellants.

MICHAEL HERBERT COHEN, Saiber LLC, Florham Park, New Jersey, *for* Appellees-Cross-Appellants.

MINER, Circuit Judge:

Plaintiff-appellant-cross-appellee Federal Insurance Company ("Federal"), as subrogee of regional automobile club AAA Mid-Atlantic, Inc. ("AAAMA" or "AAA Mid-Atlantic"), appeals from a judgment entered October 21, 2009, in the United States District Court for the Southern District of New York (Marrero, J.), granting in part and denying in part its motion for summary judgment. Federal Ins. Co. v. Am. Home Assurance Co., 664 F. Supp. 2d 397 (S.D.N.Y. 2009). Defendants-appellees-cross-appellants, American Home Assurance Company ("AHA") and National Union Fire Insurance Company of Pittsburgh, PA ("NUIC") (collectively, the "defendants"), cross appeal from that same judgment, which granted in part and denied in part their motion for summary judgment.

Federal originally brought this action in New York Supreme Court, New York County, against defendants, seeking a declaratory judgment and ancillary relief to establish the obligation of the defendants to indemnify AAAMA in a personal injury action arising from an accident involving a tow truck operator who was a preferred service provider for AAAMA. Federal paid $26.5 million out of a $27.25 million settlement of the underlying action. Defendants, invoking diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), removed the action to the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1441.

In its October 13, 2009 Decision and Order, the District Court determined that (1) Florida law governed interpretation of the commercial general liability ("CGL") policies issued by defendants; (2) Federal reserved its right to proceed in an action for equitable contribution against the defendants under the policies; (3) defendants' policies provided coverage to AAAMA, and AAAMA's loss was within the coverage of the policies; (4) contribution was not limited by (a) a jury's assessment of AAAMA's percentage of fault in the underlying personal injury action or (b) an amount attributable to AAAMA's direct liability, as found by the jury; (5) contribution of $1 million by AHA, the primary insurer, and $12 million by NUIC, which provided umbrella coverage, was warranted; and (6) Federal was entitled to prejudgment interest, accruing from the date of

3

settlement. Accordingly, the court entered judgment ordering (1) AHA to pay Federal $1 million plus prejudgment interest from June 13, 2007, at the rate set by Florida law, of $235,095.89; and (2) NUIC to pay Federal $12 million plus prejudgment interest from June 13, 2007, at the rate set by Florida law, of $2,821,150.69.

On appeal, Federal claims that the District Court erred in its determination that the umbrella policies issued by Federal and NUIC, each in the amount of $25 million, must share equally in the payment obligation of the settlement of the underlying personal injury action after the $1 million limit of Federal's primary policy and the $1 million limit of AHA's primary policy were paid. Federal seeks to recover from AHA and NUIC $25 million of Federal's $26.5 share of the $27.25 million settlement paid on behalf of Federal's named insured, AAAMA, in the underlying personal injury action brought by Richard Cannon in New Jersey state court.[1] Federal claims that its policy was excess to NUIC's policy and, as such, the $25 million NUIC umbrella policy must be exhausted before Federal's $25 million umbrella policy applies.

The defendants argue on cross-appeal that the settlement and verdict in the underlying personal injury action establish that AAAMA's liability "arises out of" its own operations and not AAA's operations. Alternatively, the defendants claim that if AAAMA's liability to Cannon arose out of AAA's operations, then Federal and NUIC should share that loss equally, as the District Court found. They argue that the "other insurance" provisions in both umbrella policies purport to be excess of each other and that those provisions therefore cancel each other out, resulting in an equal obligation to cover the loss. Defendants also argue that ratable contribution should apply and that contribution should be limited to that portion of the underlying settlement reasonably attributable to AAAMA's direct negligence. Finally, defendants argue that the District Court abused its discretion in awarding to Federal prejudgment interest on any amount owed to Federal.

---

[1] Of the $26.5 million paid to settle the underlying personal injury action, Federal does not seek reimbursement for the $500,000 paid under its business auto policy ($500,000 per accident) or for the $1 million paid under its $1 million primary policy. Am. Home Assurance Co., 664 F. Supp. 2d at 409 n.5.

4

For the reasons stated below, we reverse the judgment of the District Court and remand for entry of judgment in favor of defendants-appellees.

**BACKGROUND[2]**

I.     The AAA Organization and the Member Clubs

The American Automobile Association, Inc. ("AAA" or "AAA National") is an affiliation of seventy independently operated and managed automobile clubs ("Member Clubs"), including AAAMA. AAA's activities include maintaining "a strong federation of not-for-profit Member Clubs organized to achieve the objects and purposes of [AAA] in assigned service territories." Am. Home Assurance Co., 664 F. Supp. 2d at 402. These objectives and purposes, as set forth in AAA's Certificate of Incorporation and Bylaws (the "Bylaws"), include "serv[ing] the personal and motoring needs of individual Member Clubs." Id. "Each Member Club operates in an assigned service area as an independent and sovereign entity chartered under the laws of the state in which it operates." Id. AAA does not own or operate the Member Clubs; does not issue memberships to the public; does not directly receive revenue from members; and does not contract with the towing companies that provide emergency road service. Id.

Approximately forty-six million individuals are members of the Member Clubs. These individuals can obtain emergency roadside service anywhere in the United States by calling 1-800-AAA-HELP, the number listed on the AAA membership card distributed to all members. Id. "[E]mergency road service is the 'core service offering of AAA'" and its Member Clubs, and "emergency road service is the number one reason members join and renew their membership" with the Member Clubs. App. 1123. When a member of one Club is serviced by another Club, the former Club is reimbursed by the latter. Am. Home Assurance Co., 664 F. Supp. 2d at 402. AAA coordinates payment through a reciprocal clearing bureau that allocates charges among the Member Clubs. Id. In most cases, the member does not know which AAA Member Club will respond to his

---

[2] In reciting the background for our analysis in this case, we rely essentially on the factual findings made by the District Court.

or her call or even that there are different Member Clubs. Id. at 407–08. Each responding tow truck and driver designated by a Member Club to provide emergency roadside service displays the same AAA insignia, aims to arrive within a thirty-minute response window set by AAA, and reports estimated times of arrival and actual times of arrival to AAA, all to comply with AAA's automotive quality standards. Id. at 408.

Member Clubs must go through AAA's accreditation process every five years or whenever a Member Club is determined not to be in compliance with AAA's rules and regulations. The accreditation process includes an inspection to verify that the procedures, services rendered, documents, and appearance of the Member Club are in compliance with AAA's standards. Id. at 402. In addition to each Member Club being accredited at least once every five years, Member Clubs must submit their audited financial statements on an annual basis to AAA. Id.

One requirement of AAA's accreditation process is an evaluation of the automotive services rendered by the Member Club, and emergency roadside services are emphasized within that evaluation. Id. Once accredited, AAA monitors individual Member Clubs' emergency roadside services based on response times and requires certain member satisfaction scores on emergency roadside Member Satisfaction Surveys. Id.

Pursuant to its Bylaws, AAA has the right to assign service areas to Member Clubs; approve activities to be undertaken by Member Clubs; make, publish, amend, and enforce rules and regulations defining Member Club services to assure their uniform availability to motorists throughout the United States and Canada; and censure, expel, or revoke the accreditation of any Member Club that violates the Bylaws, quality standards, or any of AAA's rules and regulations. Id. at 402–03.

II.    The Underlying Personal Injury Action

On September 6, 2001, on Route 1 South in the Township of Woodbridge, New Jersey, a tow truck operated by Gerard M. Taber collided with a stalled vehicle operated by Richard Douglas Cannon, then twenty-one years of age, causing Cannon's stalled vehicle to explode. The accident

6

resulted in permanent injuries to Cannon including "horrific burn injuries." Am. Home Assurance Co., 664 F. Supp. 2d at 403. At the time of the accident, Taber was responding to a roadside assistance call to change a flat tire in Parlin, New Jersey. The call originated from the 1-800-AAA-HELP line. Id. Taber's employer and the owner of the truck, E & D Auto Repair Towing ("E & D"), was an AAAMA Preferred Service Provider ("Provider"). Id. As an AAAMA Provider, E & D was contractually obligated to provide roadside assistance to AAA Members within the region of AAAMA's coverage, and E & D was authorized to display the AAA insignia and emblem. Id.

After the accident, Cannon filed an action for damages in Superior Court of the State of New Jersey, County of Middlesex, against Taber, E & D, AAAMA, and AAA, among other defendants. Cannon's Fourth Amended Complaint alleged that "E & D and Taber were the agents and/or servants and/or employees and/or acting on behalf of and/or acting for the benefit of and/or acting under the supervision and control of AAA and AAAMA." Id. The Fourth Amended Complaint also alleged that Taber, E & D, AAA, and AAAMA "'did act in a negligent and careless manner so as to cause the motor vehicle being operated by defendant [Taber] to strike the automobile of[Cannon].'" Id. Cannon further alleged that a mobile data terminal ("MDT")[3] was installed in the flat-bed truck being operated by defendant Taber and that the MDT was not reasonably fit, suitable, or safe for its intended purposes and reasonably foreseeable uses and was designed in a defective manner, and exposed the public to an unreasonable risk of injury.

The Cannon trial began on April 10, 2007, and at trial, Taber testified that while he was en route to provide roadside assistance, the MDT caused him to become distracted when it beeped, prompting him to check with it to obtain information about the roadside assistance call to which he was en route. Id. He then heard horns honking, turned to look at the flat-bed rear of his truck to determine whether any chains were loose, and then glanced at a woman in a nearby vehicle for approximately 10–15 seconds before turning back to look out his front windshield. At that time he

---

[3] A mobile data terminal is an electronic device placed in an emergency response vehicle to receive information pertaining to a AAA-member's break-down location.

saw Cannon's car stopped in the road. Id. Taber testified that he tried to stop but could not before rear-ending Cannon's car. Id.

Before the close of trial, AAAMA and Cannon agreed on May 31, 2007, to settle all claims against AAAMA for $27.25 million, with Federal contributing $26.5 million and AAAMA's excess insurer, Fireman's Fund, contributing $750,000. AHA and NUIC did not make any settlement offers on AAAMA's behalf. The defendants never contested the reasonableness of the settlement of the Cannon action and did not assert any affirmative defenses that the settlement was unreasonable.

Following the settlement of the claim against AAAMA, the Cannon action proceeded to trial on various issues. The state trial court instructed the jury that as a matter of law E & D controlled Taber, the agent and employee of E & D. The court also instructed the jury that E & D and Taber were negligent on the date of the accident and that this was not an issue for their consideration. The court then instructed the jury to resolve the direct negligence and agency issues. With respect to agency, the court instructed the jury to consider whether AAAMA was the master of E & D and whether AAA National was the master of AAAMA. The court explained that this issue required the jury to resolve whether AAA National controlled AAAMA's operations:

> You must determine whether or not either of these entities had a right to control the day-today basis of operation of a particular institution. In other words, did [AAAMA] have the right to . . . control the day-to-day operation of E & D Towing? That's up to you. Did . . . AAA National have the right and did they exercise a [sic] control over [AAAMA]?

App. 971.

In its verdict, the jury made the following findings. First, as to agency, the jury found that E & D and Taber were agents of AAAMA and that AAAMA was the agent of AAA. Id. Second, as to direct negligence, while the jury found AAA National negligent, it also found that AAA National's negligence did not proximately cause Cannon's injuries. In contrast, the jury found that AAAMA was both negligent and that AAAMA's negligence proximately caused Cannon's injuries. The jury also found that Cannon was negligent and that his negligence was a proximate cause of the accident.

8

The jury awarded Cannon $12 million to compensate him for his pain, suffering, disability, impairment, and loss of enjoyment of life. Examining the combined negligence the jury, inter alia, found E & D 85% liable, AAAMA 14% liable, AAA National 0% liable, and Cannon 1% liable. Id.

III.     The Insurance Policies

Federal issued three liability policies insuring AAAMA for the relevant time period, including a CGL primary policy with a limit of $1 million for each occurrence (the "Federal Primary Policy"); a CGL umbrella policy with a limit of $25 million (the "Federal Policy"); and a business auto policy with a limit of $500,000 per accident (the "Federal Business Auto Policy").

AHA issued a primary CGL policy with a limit of $1 million per occurrence (the "AHA Policy") to AAA, insuring AAA for the relevant time period. The AHA Policy contained an endorsement numbered CL 261 (the "Endorsement" or the "AHA Endorsement") naming Member Clubs as additional insureds under the AHA Policy "but only with respect to liability arising out of [AAA] operations or premises owned by [AAA]." Id. (emphasis supplied).

NUIC issued to AAA a CGL umbrella policy with a limit of $25 million that covered AAA during the relevant time period (the "NUIC Policy"). The parties have not disputed that the NUIC Policy would provide coverage for the Member Clubs to the extent that the clubs qualified as insureds under the AHA Policy. Id. at 403–04.

By letter dated April 19, 2007, AAAMA and Federal first tendered demands for insurance coverage under the AHA Policy and the NUIC Policy. Id. at 404. On May 8, 2007, the defendants disclaimed coverage under both policies. Id.

IV.     Proceedings in the District Court

Federal first brought this action in New York Supreme Court, New York County, against defendants, seeking a declaratory judgment and ancillary relief relating to the obligations of the parties to defend and indemnify AAAMA in the Cannon action. Id. at 401. Defendants removed the action to the District Court, 28 U.S.C. § 1441, invoking that court's diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).

9

In the District Court, Federal moved for summary judgment under Federal Rule of Civil Procedure 56 arguing that AAAMA is insured under policies issued to AAA by AHA and NUIC, and Federal is therefore entitled to reimbursement for $25 million of the $26.5 million it paid to settle the Cannon action. Defendants also moved for summary judgment, arguing that they do not insure AAAMA with respect to any liability arising from the Cannon action, and alternatively, if they do insure AAAMA, that they are obligated to pay, according to the principles of equitable contribution, only half of the $25 million that Federal seeks.

In ruling on the motions for summary judgment, the District Court first examined whether New York or Florida law should apply. In support of the application of Florida law, the court noted that it was presented with the question of "interpret[ing] the AHA Policy issued to AAA," and "AAA, the named insured, is headquartered in Florida, and the AHA Policy was issued to AAA in Florida. Thus, Florida law should be used to interpret the AHA Policy." Am. Home Assurance Co., 664 F. Supp. 2d at 404–05. Both parties argued to the District Court, however, that New York law, as the law of the forum state, should be applied because "absent an actual conflict, the [c]ourt [would be] free to apply New York law." Id. at 405 (citing In re Allstate Ins. Co. (Stolarz), 613 N.E.2d 936, 937 (N.Y. 1993)). The parties contended that there was no conflict in this case between the laws of New York and Florida on the issues raised. Federal did recognize, however, that a possible conflict between Florida and New York law existed with respect to insurance policy notice requirements, which Federal suggested was not at issue in this case.

The District Court disagreed with the parties' contention that New York law should be applied and applied Florida law. In so ruling, the District Court first noted that the defendants' policies require that the insured give notice to the defendants of the need for coverage "as soon as practicable." Id. at 405. As to New York's law on the failure to comply with a notice provision in an insurance contract, the District Court stated that failure to comply with such a notice provision in New York would relieve an insurer of its duty to indemnify. Id. at 405 (citing New York v. Blank, 27 F.3d 783, 794 (2d Cir.1994) ("[A]lthough the duty to provide notice rests primarily upon the

10

insured, a co-insurer hoping to benefit from the presence of another insurer, must ensure that the notice provisions of the insured policy with the second insurer are complied with.")). Thus, if Federal failed adequately to provide the defendants with notice, Federal would be prohibited from receiving any contribution from defendants. Id.

With regard to Florida law, however, the District Court noted that failure to comply with an insurance contract's notice provision can be excused if the insurer has not been prejudiced. Id. (citing Tiedtke v. Fid. & Cas. Co., 222 So.2d 206, 209 (Fla. 1969); Zurich Am. Ins. Co. v. Cutrale Citrus Juices USA, Inc., No. 5:00–CV–149–OC–10GRJ, 2002 WL 1433728, at *1–2 (M.D. Fla. Feb. 11, 2002) ("[L]ate notice raises a rebuttable presumption of prejudice to the insurer that the insured can overcome if it can demonstrate that the insurer was not in fact prejudiced by the delay.")). In concluding that there was no prejudice here, the District Court found as follows:

> [E]ach jurisdiction provides substantively different rules.
>
> As a matter of Florida law, Federal can rebut the presumption of prejudice to Defendants. The rationale driving the notice requirement is that insurers should be provided the opportunity to investigate the occurrence, control litigation, and participate in settlement negotiations. None of those rationales apply here because Cannon sued AAA as well as AAAMA[.] As AAA's insurers, Defendants were able to perform their own investigation of the accident. Defendants' counsel worked with Federal's counsel throughout the litigation, and Defendants' counsel was asked to participate in the settlement. Though Defendants did not receive an official request to defend and indemnify until April 2007, they were fully aware of the matter and were in no way prejudiced by any delay. Having found that Federal satisfies the threshold notice requirement, the [c]ourt will proceed to the merits of Federal's claim.

Id.

The court next turned to the language of the Endorsement that provided for liability arising out of AAA's operations, finding that the language was "generally accepted" and "unambiguous." Id. at 408. Applying that language to the facts of this case, the court found that AAA National's operations "include a level of emergency roadside oversight and coordination that is, at the very least, 'connected to' the Cannon accident and AAAMA's liability." Id. at 407. The court found as follows: "[t]he accident 'arises out of' the call to an AAA number, which is serviced by AAA. The accident was 'originating from, incident to, or having a connection with' the AAA number, an AAA

11

operation." Id. at 408. Accordingly, the court determined that the Endorsement provision was satisfied.

As to the defendants' contention that any purported contribution should be limited to 14% of the settlement, AAAMA's fault percentage found by the jury, the District Court rejected that argument and found that "[a]ny attempt to determine settlement contribution amounts based on actual jury outcome would distort the parties' ex ante assessment of liability." Id. at 408–09. Thus, the District Court held that the entire settlement amount was subject to equitable contribution. Id. at 409. The court also found that the defendants' contribution should not be limited by an apportionment of AAAMA's direct and vicarious liability. Id. at 409.

Having found that the AHA Policy and the NUIC Policy insure AAAMA as an additional insured with respect to liability arising out of the Cannon action, the District Court examined whether defendants must reimburse Federal for all or a portion of the settlement amount. The court noted that under the $27.25 million settlement, (1) the Federal Business Auto Policy, a primary policy not at issue, "provided $500,000 of coverage"; (2) the Federal Primary Policy "paid $1 million"; (3) the Fireman's Fund, an excess policy also not at issue, contributed $750,000; and (4) the Federal Policy paid $25 million. Id.

With regard to the Federal Primary Policy and AHA Policy, each primary policies, the court found that the AHA Policy should have been exhausted to its limits — $1 million — before the Federal Policy was applied to pay the settlement amount. Id. The defendants did not "dispute that any primary coverage obligation found by the court would be shared by the AHA Policy with the Federal Primary Policy." Id. Thus, the court found that AHA must therefore reimburse Federal $1 million under the AHA Policy. Id.

As to the Federal Policy and the NUIC Policy, both excess or umbrella policies, each policy contained "other insurance" provisions requiring the policy to be considered excess over any other applicable excess policy. Id. at 410–11. The District Court found that each policy was "written to provide coverage beyond primary business auto and general liability policies, and although their

12

precise language varies, the [c]ourt finds that they are incompatible." Id. at 411. The court held that under Florida law, the "mutually repugnant clauses drop out, and each policy must share equally the remainder of the settlement amount." Id. Thus, after contribution by the primary insurers totaling $2.5 million (and the Firemen's Fund excess policy in the amount of $750,000), the court found the amount due to be $24 million and ordered NUIC to reimburse Federal $12 million. Id.

Finally, the District Court awarded Federal prejudgment interest, as Federal was found to have suffered an out-of-pocket loss. Id. The court found that Federal paid the entire sum of the settlement, a portion of which the defendants were obligated to pay, and fixed the date of loss as the date of settlement, June 13, 2007. The court ordered that Federal was entitled to prejudgment interest from that date at the statutory rate under Florida Law. Id. (citing Fla. Stat. § 55.03 (2010)). Judgment was entered accordingly, and a timely appeal and cross appeal followed.

Federal appeals only that part of the District Court's judgment that held that the "other insurance" provisions required equal sharing, arguing that the court erred by disregarding the Federal Policy's language that "[it] will not make any payments until the other insurance has been exhausted by payment of claims." Id. at 411. Federal therefore claims that the NUIC Policy should be exhausted before any amount is paid from the Federal Policy.

The defendants argue in the cross-appeal that under the plain language of the Endorsement contained in the AHA Policy, that AAAMA's liability did not "arise out of" AAA's operations, and, thus, neither the AHA Policy nor the NUIC Policy should be required to contribute to Federal's settlement obligations. In the alternative, AHA argues that while the District Court correctly apportioned the loss between Federal and NUIC, Federal is not entitled to prejudgment interest.

**ANALYSIS**

I.    Standard of Review

We review a district court's grant of summary judgment de novo, "construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor." Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010) (internal

13

quotation marks omitted). "Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." O & G Indus., Inc. v. Nat'l R.R. Passenger Corp., 537 F.3d 153, 159 (2d Cir. 2008) (brackets and internal quotation marks omitted); see also Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion."). We also review de novo a district court's choice of law determination. Fieger v. Pitney Bowes Credit Corp., 251 F.3d 386, 393 (2d Cir. 2001). We review a district court's award of prejudgment interest for an abuse of discretion. New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co., 352 F.3d 599, 602–03 (2d Cir. 2003).

II.     Choice of Law

The District Court held that Florida law applies because the law of the forum state, New York, and the law of Florida differ as to the effect of an insured's late notice to its insurer. While the defendants asserted affirmative defenses of late notice in their answers, the defendants did not raise this issue in their cross-motion for summary judgment or in opposition to Federal's motion for summary judgment. Nor do the defendants contest the application of New York law on appeal, as the parties agree that New York law should apply. Under New York choice of law rules, the first inquiry in a case presenting a potential choice of law issue is whether there is an actual conflict of laws on the issues presented. Fieger, 251 F.3d at 393. If not, no choice of law analysis is necessary. Id. Moreover, where the parties agree that New York law controls, this is sufficient to establish choice of law. See Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) (applying New York law and stating that "implied consent . . . is sufficient to establish choice of law" (quotation marks and internal citation omitted)). Because the only potential conflict between New York and Florida law pertains to the late notice issue and neither party raises that issue on appeal, we accept the agreement of the parties that the law of the forum controls, and we therefore apply New York law.

14

III.    Whether AAAMA Qualifies as an Additional Insured Under the Endorsement

The AHA Endorsement names Member Clubs, such as AAAMA, as additional insureds under the AHA Policy "but only with respect to liability arising out of [AAA's] operations or premises owned by [AAA]." (emphasis supplied). Thus, whether or not defendants must contribute to the settlement payment made by Federal depends on a threshold determination of whether AAAMA qualifies as an additional insured under the AHA Policy issued to AAA National. This determination requires us to examine the meaning of the phrase "arising out of" in conjunction with the word "operations."

A.    The Operative Phrase Defined

"The New York approach to the interpretation of contracts of insurance is to give effect to the intent of the parties as expressed in the clear language of the contract." Mount Vernon Fire Ins. Co. v. Belize NY, Inc., 277 F.3d 232, 236 (2d Cir. 2002) (internal quotation marks omitted). In doing so, "[w]e must give 'unambiguous provisions of an insurance contract . . . their plain and ordinary meaning.'" 10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co., – F.3d – , 2011 WL 285140, *6 (2d Cir. Jan. 31, 2011) (quoting Essex Ins. Co. v. Laruccia Constr., Inc., 898 N.Y.S.2d 558, 559 (App. Div. 2010). "We cannot disregard 'the plain meaning of the policy's language . . . in order to find an ambiguity where none exists.'" Id. (quoting Empire Fire & Marine Ins. Co. v. Eveready Ins. Co., 851 N.Y.S.2d 647, 648 (App. Div. 2008)). "[I]t is common practice for the courts of [New York] State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract." Id. (quoting Mazzola v. Cnty. of Suffolk, 533 N.Y.S.2d 297, 297 (App. Div. 1988) (internal citation omitted)). We have also explained that "[i]f the court finds that the contract is not ambiguous it should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence and it may then award summary judgment." Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002) (citations and quotation marks omitted).

On the other hand, under New York law, contract claims are generally not subject to

15

summary judgment if the resolution of a dispute turns on the meaning of an ambiguous term or phrase. See Haber v. St. Paul Guardian Ins. Co., 137 F.3d 691, 695 (2d Cir. 1998) ("Language in an insurance contract will be deemed ambiguous if reasonable minds could differ as to its meaning."); see also State v. Home Indem. Co., 486 N.E.2d 827, 829 (N.Y. 1985) (per curiam) ("If . . . the language in the insurance contract is ambiguous and susceptible of two reasonable interpretations, the parties may submit extrinsic evidence as an aid in construction, and the resolution of the ambiguity is for the trier of fact."). However, where language in a contract is ambiguous, summary judgment can be granted "if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language." Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 158 (2d Cir. 2000).

The question of "whether the language of a contract is clear or ambiguous" is one of law, and therefore must be decided by the court. Id. at 158. In making this decision, the "court should not find the language ambiguous on the basis of the interpretation urged by one party, where that interpretation would strain the contract language beyond its reasonable and ordinary meaning." Metro. Life Ins. Co. v. RJR Nabisco, Inc., 906 F.2d 884, 889 (2d Cir. 1990) (internal quotation marks and citation omitted).

The New York Court of Appeals has held that the phrase "arising out of" is "'ordinarily understood to mean originating from, incident to, or having connection with.'" Maroney v. N.Y. Cent. Mut. Fire Ins. Co., 5 N.Y.3d 467, 472 (2005) (quoting Aetna Cas. & Sur. Co. v. Liberty Mut. Ins. Co., 459 N.Y.S.2d 158, 160 (App. Div. 1983)); Mount Vernon Fire Ins. Co. v. Creative Hous. Ltd., 668 N.E.2d 404, 406 (N.Y. 1996) ("There is no significant difference between the meaning of the phrases 'based on' and 'arising out of' in the coverage or exclusion clauses of an insurance policy. Moreover, we find neither phrase to be ambiguous." (internal citations omitted)). The phrase "requires only that there be some causal relationship between the injury and the risk for which coverage is provided." Maroney, 5 N.Y.3d at 472 (emphasis supplied); see also Consol. Edison Co. v. Hartford Ins. Co., 610 N.Y.S.2d 219, 221 (App. Div. 1994) (stating that the phrase

16

"arising out of" in the context of an additional insured clause in an insurance policy "focuses not upon the precise cause of the accident . . . but upon the general nature of the operation in the course of which the injury was sustained"); accord Turner Constr. Co. v. Kemper Ins. Co., 198 F. App'x 28, 30 (2d Cir. 2006).

Further, additional insured provisions, extending coverage for liability "arising out of" the named insured's work or operations, are applied consistent with "'common speech' and the reasonable expectations of a businessperson." Belt Painting Corp. v. TIG Ins. Co., 795 N.E.2d 15, 17 (N.Y. 2003). Because the term "operations" is not defined in the AHA Policy, "operations" is given its ordinary meaning, considering "the general nature of the operation in the course of which the injury was sustained." Consol. Edison Co., 610 N.Y.S.2d at 221. The ordinary meaning of the word in the context of this case is the "doing or performing" of work. Webster's Third New International Dictionary 1581 (2002 ed.); see also In re Chateaugay Corp. v. LTV Steel Co., 891 F.2d 1034, 1039 (2d Cir. 1989) (stating, in the context of the coal industry, that "the meaning of the word 'operations' should cover those methods of . . . mining, production, preparation, transportation and other ancillary activities in which the [parties] were engaged"). Within the bankruptcy context, we have held that the word "operations" includes a business' "ancillary activities." Chateaugay Corp., 891 F.2d at 1039 (finding "transportation and other ancillary activities" within the coal production operation).

We agree with the District Court insofar as it found that the plain language "arising out of . . . operations" in the AHA Policy's Endorsement is unambiguous. It seems to us, however, that the learned District Court misapplied the unambiguous language of the Endorsement here.

B.      The Operative Phrase in Other Evidentiary Contexts

Federal seeks indemnification for its settlement with Cannon on behalf of AAAMA, arguing that the Cannon accident arose out of AAA National's operations, in particular, AAA's activities involving "emergency road service." In determining that the action did not arise out of the operations of AAA National, we examine some cases in which the operative phrase has been

17

applied.

In <u>Worth Construction Co. v. Admiral Insurance Co.</u>, 888 N.E.2d 1043 (N.Y. 2008), a subcontractor, Pacific, named the general contractor, Worth, as an additional insured on its policy but only with respect to liability "arising out of" Pacific's operations. <u>Id.</u> at 1044. Pacific constructed a staircase frame, and another subcontractor was hired to apply the fireproofing. A second subcontractor's employee slipped on the fireproofing. <u>Id.</u> After a personal injury claim was filed against Worth, Worth filed a third-party action against Pacific and its insurer, Farm Family Casualty Insurance Company ("Farm Family"). <u>Id.</u> Pacific sought summary judgment on Worth's third-party claim in the underlying injury suit. Worth thereafter conceded that the underlying personal injury claim did not arise out of Pacific's work or operations and that Pacific was not negligent, and thus the trial court granted summary judgment to Farm Family. <u>Id.</u> at 1045. The Appellate Division disagreed, holding that for "coverage purposes, it was sufficient that [the subcontractor's employee's] injury was sustained on the stairs." <u>Id.</u> (internal quotation marks omitted).

The New York Court of Appeals disagreed with the Appellate Division. Although recognizing that "[g]enerally, the absence of negligence, by itself, is insufficient to establish that an accident did not 'arise out of' an insured's operations," the court agreed with Farm Family that Worth's admission that its claims of negligence against Pacific were without factual merit — and "that the staircase was merely the situs of the accident" — established that the accident did not "arise out of" Pacific's operations. <u>See id.</u> (stating that after Worth's admission, "it could no longer be argued that there was any connection between [plaintiff's] accident and the risk for which coverage was intended").[4]

In <u>Bovis Lend Lease LMB, Inc. v. Garito Contracting, Inc.</u>, 885 N.Y.S.2d 59 (App. Div.

---

[4] Although the parties cite to <u>Regal Construction Corp. v. National Union Fire Insurance Co. of Pittsburgh, PA</u>, 15 N.Y.3d 34 (2010), <u>Regal</u> is distinguishable from <u>Worth</u> because in <u>Regal</u> the court found a causal relationship while reaffirming <u>Worth</u>'s holding. As discussed <u>infra</u>, it is the absence of a causal relationship that also distinguishes <u>Regal Construction Corp.</u> from the facts of this case.

18

2009), a subcontractor, Garito, named a general contractor, Bovis, as an additional insured on its policy, but only with respect to liability "arising out of" Garito's work for Bovis. Bovis, 885 N.Y.S.2d at 60. Garito removed a garbage chute enclosure, leaving a hole in the concrete slab floor, and another subcontractor's employee was injured when he fell through the hole. Id. The injured plaintiff brought suit against Bovis, and Bovis filed a third-party claim against Garito. Id. at 60–61. The jury in the personal injury case found that both Bovis and Garito were negligent but that Garito's negligence was not a substantial factor causing the accident because the named insured did not agree to provide protection at the worksite. Id. at 61. The Appellate Division agreed with Garito's insurer — i.e., that Bovis's liability arose out of its own operations, and not Garito's work. Id. at 61–62. Applying Worth, the Appellate Division reasoned that "the jury's finding that Garito's negligence was not a substantial factor . . . is as conclusive as the admission by Worth that Pacific's activities were not a proximate cause of the underlying accident." Id.

In Greater N.Y. Mutual Insurance Co. v. Mutual Marine Office, Inc., 769 N.Y.S.2d 234 (App. Div. 2003), a contract between a parking garage owner, Seward, and operator, Ulltra, provided that Ulltra was responsible for all repairs except for structural ones. Greater N.Y., 769 N.Y.S.2d at 235. Ulltra's policy with Mutual Marine Office ("MMO") named Seward as an additional insured, providing coverage for damage to cars in the garage "in connection with the insured's [Ulltra's] 'garage operations.'" Id. at 236. Coverage under the MMO policy was therefore limited to "claims arising out of Ulltra's parking garage operations." Id. After the garage roof collapsed and Seward paid numerous property damage claims, its insurer, Greater New York Mutual Insurance Company, sought additional coverage from Ulltra's MMO policy. The Appellate Division determined that the parties had not intended for the additional insurance to cover Seward's liability since the contract established that Seward alone would be responsible for structural repairs. Id. at 239. The court reasoned that "[t]he collapse of the parking garage roof clearly did not arise out of Ulltra's parking garage operations but, rather . . . out of structural defect in the building housing the parking garage, as to which, under the lease, Seward had the duty of repair." Id. at 237–38. Under the provisions of

19

the MMO policy, the court determined that "it is clear that the additional insured endorsement was never intended to extend to Seward's liability arising out of a roof defect in a building it owns and which, under its lease with Ulltra, it is obligated to maintain." Id. at 238. Thus, "the additional insured endorsement was never triggered." The court also noted that additional insurance is often used to ensure that the party closest to the operations is the one held responsible when there is a loss. Id. at 238.

C.      The Operative Phrase in the Case at Bar

Contending that AAA was engaged in "operations" at the time of the accident, Federal argues that AAA's activities were "far more than 'ancillary' or 'incidental' to AAAMA's emergency road service," especially given that emergency roadside service was AAA's "core" operation. We disagree. AAA National is a "not-for-profit affiliation of independently operated automobile clubs." At the time of the accident, AAA National's activities included "maintaining the federation of clubs" and "accredit[ing] member clubs; promot[ing] use of the MDTs; issu[ing] towing, service, and lockout manuals to the member clubs; disseminat[ing] quality standards, including a thirty-minute response time goal; and maintain[ing] the toll-free telephone number that directed service calls to the member club operating in the area of the call's origin." Its activities were therefore much different from the operations of AAAMA, which provided actual roadside emergency services, including towing. At the time of Cannon's accident, AAAMA "owned" and "operated" over 100 trucks and also contracted with towing contractors, including E & D. AAAMA also financed the truck Taber was driving, required E & D to use the MDT, trained E & D to use the MDT, and equipped the truck with the MDT.

In addition, the minimum causal relationship between "the injury and the risk for which coverage is provided" is lacking here. See Maroney, 5 N.Y.3d at 472. AAA National's accreditation process and other activities did not contribute to Cannon's injuries. And although AAA National promulgated a suggested 30-minute response time for responding to roadside-assistance calls from members, Taber testified that he was not speeding while en route to the call in Parlin, New Jersey,

20

and that he had more than adequate time to get to his next service call. Moreover, the accident occurred only six minutes after Taber received the service call and started to drive. We therefore conclude that AAAMA's liability to Cannon is not causally connected to AAA National's 30-minute response time standard in this case.

We also note that while AAA National recommended the MDT after evaluating its technology, it never mandated its use. And although Taber testified that while he was initially distracted by the MDT, he subsequently turned to check the flat-bed, and then became distracted by a woman in a passing car, having stared at her for 10–15 seconds before immediately thereafter slamming into Cannon's vehicle.

Furthermore, we reject the District Court's conclusion that "AAA's operations include a level of emergency roadside oversight and coordination that is, at the very least 'connected to' the Cannon accident and AAAMA's liability," i.e., AAA National's role in operating the 1-800-AAA-HELP line. Am. Home Assurance Co., 664 F. Supp. 2d at 407. The court found that the connection was supported by the following evidence:

> Most importantly, an AAA member can call 1-800-AAA-HELP anywhere in the country and receive emergency roadside assistance twenty-four hours a day, seven days a week. All of the service calls are processed by AAA's reciprocal clearing bureau, which allocates charges among the clubs. In most cases, the member does not know which AAA Member Club will respond to his or her call, or that there are even different Member Clubs. Each responding tow truck and driver displays the same AAA insignia, aims to arrive within the thirty-minute window set by AAA, and reports estimated times of arrival and actual times of arrival to AAA, all to comply with AAA's automotive quality standards. . . . At the time of the accident, Taber was responding to an AAA member call. The record shows that the member called the AAA nationwide 1-800 number and was then directed to the Member Club, which dispatched E & D. Taber hit Cannon's car on his way to help an AAA member who had called the AAA number.

Id. at 407–08. We find, however, that reliance upon such evidence is akin to the general contractor's claim in Worth that its liability arose out of Pacific's operations simply because Pacific had built the stair frame that was the site of the injury, Worth Constr. Co., 888 N.E.2d at 1045–46, or to the parking garage owner's claim in Greater New York that the damage to cars caused by the garage roof's collapse arose out of the operator's operations simply because the cars were parked in the

21

garage at the time of the collapse, Greater N.Y. Mut. Ins. Co., 769 N.Y.S.2d at 236–37. We conclude that AAAMA's liability to Cannon did not arise out of AAA National's operations. Here, AAA National served only as a centralized helpline, limiting its role to directing calls to the proper Member Club in which an AAA member's call originated.

Similarly, the organizational structure of AAA National and its member organizations precludes us from concluding that AAA National's operations include emergency road service. The record establishes that the AAA organization has divided its activities and operations into sets of distinct functions — AAA National directs policies, accredits member clubs, and maintains a centralized telephone number; and the Member Clubs issue memberships to the public and engage in physical roadside assistance. AAA National does not employ towing companies or maintain towing trucks. In this way, while roadside assistance may be the AAA family's "core operation," actual roadside service is provided by the Member Clubs. AAA National's participation is limited to accreditation, policy making, and oversight. Its operations pertain only to those functions.

\* \* \* \*

In sum, we conclude that AAAMA's liability did not "arise out of" AAA National's "operations." Because we conclude that the AAA National contract does not insure AAAMA as an additional insured in this action, we need not consider the parties' remaining arguments — that the "other insurance" provision in the Federal Policy renders it excess to the NUIC Policy, that the defendants' contribution should be limited to the 14% liability that the jury assigned to AAAMA, or that Federal is entitled to prejudgment interest.

## CONCLUSION

In accordance with the foregoing, we conclude that the District Court erred in finding that AAAMA is an additional insured in the Cannon action, and we REVERSE the judgment of the District Court and remand for the entry of summary judgment in favor of the defendants-appellees.

22