McMahon, C.J.
This insurance coverage dispute pivots on the definition of the word "vehicle" as used in an "all risks" policy insuring a luxury cooperative apartment building on the Upper East Side of Manhattan.
The material facts are simple and undisputed. The gas line running to a line of apartments ruptured shortly after a recycling bin was brought into the basement by the company that runs the New York City e-cycle (electronics recycling) program. As a result, the gas had to be turned off throughout the building. The New York City Administrative Code requires that a building's gas system pass an integrity test before gas can be turned back on once it has been turned off. The contractor who was hired to conduct the test ascertained that, in order to pass the test-which is conducted at a considerably higher pressure than the system operates at under normal use-a number of pipes and valves had to be replaced, which necessitated opening walls in the residents' kitchens. The building incurred costs in excess of a half million dollars.
The building demanded reimbursement for the costs it incurred in connection with the restoration of gas service under the "all risks" policy that insured the building. Its insurer, Fireman's Fund, disclaimed coverage, on the ground that the policy did not cover damage attributable to the testing of gas lines that was mandated by local ordinance. The building protested, arguing that there was an exception to the exclusion if the damage to the gas system that occasioned the municipally-required testing was caused by a "vehicle." It argued that the recycling bin-essentially an oversized garbage bin mounted on four wheels-qualified as a "vehicle."
The matter has been presented to the Court on cross-motions for summary judgment.
I conclude that the term "vehicle"-which appears in the policy's Gas Systems *532 Endorsement as part of the phrase "Aircraft or Vehicles"-does not encompass what is, in essence, a mobile trash can. Therefore, I grant Defendant's motion for summary judgment and direct that Plaintiffs case be dismissed.
However, in the event that a higher court disagrees with my assessment, I conditionally grant so much of Plaintiffs cross motion for summary judgment as challenges Fireman's Fund's other reasons for denying coverage for the loss in question-reasons relating to "wear and tear" and to defects or deterioration allegedly resulting from faulty maintenance.
FACTS
The following facts are undisputed.
The Incident
1070 Park Avenue is a first class cooperative apartment building on the Upper East Side of Manhattan. It has been operational for eighty years.
The building has gas lines that run to the kitchens of every apartment.
Although the gas system was installed decades ago, there is no evidence in the record that the building was experiencing any problems with the gas lines or the delivery of gas to the residents' kitchens prior to the incident that forms the basis for this lawsuit. (Pl.'s Statement of Undisputed Facts ("Pl's 56.1") ¶ 10, ECF No. 99.)
The building participates in New York City "e-cycle" program, which is a recycling program for electronics, such as televisions, computer equipment, tablets, mobile phones and office machines. (Decl. of Jay Weintraub in Support of Def's Mot. Summ. J. ("Weintraub Decl."), Ex. Z, ECF No. 87-54.) Participating buildings receive heavy duty "storage bins" in one of two sizes from the New York City Department of Sanitation, into which building staff places electronics that are discarded by tenants. The city arranges for the periodic pick-up of the electronic recyclables from the building and their disposition, in partnership with an entity known as Electronic Recyclers International, Inc. (Id. )
Like many oversized trash bins, the e-cycling storage bins have wheels on them, which makes it easier to move them from the place where they store refuse to the place where they are emptied.
At 1070 Park Avenue, the e-cycle bin is kept in the laundry room in the basement of the building.
On the afternoon of July 14, 2016, the contractor who collects the building's "e-cycle" recycling material arrived at the building to replace the existing bin with a new recycling bin.
The new bin, which was larger than its predecessor, was also placed in the laundry room.
Shortly after the recyclers left the premises, someone smelled gas. Building staff discovered that the gas meter leading to Unit 1C had been damaged, causing a gas leak. Building employees observed that the meter was both dented and dislodged. (Aff. of Daniel Lambe in Support of Def.'s Mot. Summ. J. ("Lambe Aff."), Exs. Bl & B2, ECF No. 90-10, 90-11.)
The meter had not been damaged earlier in the day and there had been no smell of gas earlier in the day. (Id. ).
The building staff concluded that the damage was caused by the individuals who were placing the new, larger recycling bin in the laundry room; they must have bumped into and damaged the gas meter. As there were no eyewitnesses and the recyclers did not report any accident to anyone in the building, the evidence supporting this theory is circumstantial. However, there is absolutely no evidence of any *533 other possible cause for the damage to the meter and the resulting gas leak; and three building employees testified that employees of the recycling company brought an oversized e-cycling bin into the basement immediately before the building began to smell of gas. (Aff. of Mohammad Fayyaz in Support of Pl's Mot. Summ. J., ECF No. 95; Aff. of Amado Olivieri in Support of PL's Mot. Summ. J., ECF No. 96; Aff. of Edmundo Maceda in Support of PL's Mot. Summ. J., ECF No. 97.)
Circumstantial evidence is of no less probative value than direct evidence. There being no evidence whatever (direct or circumstantial) that contradicts the evidence of the building employees, the Court thus deems it undisputed that the recyclers caused the leak by their careless handling of the recycling bin, which hit the gas meter and damaged it.
Upon being summoned, Con Edison "red tagged" the building and shut off the gas to the entire building. Peter Lambe Plumbing was engaged to repair the leak and effect restoration of gas service to the building.
Per the Administrative Code of the City of New York, once the gas was turned off by Con Edison, it could not be turned back on until the building's entire gas distribution system was checked. See N.Y.C. Admin. Code § 27-292(d).
This integrity testing, a form of high pressure testing, resulted in considerable cost to the building. It was determined that, in order to pass the testing, all gas meter assemblies in the building needed to be upgraded to include by-pass meter bars, and all apartments needed to have appliance service valves and new flex connectors installed. This required opening up walls in every apartment.
The total cost to repair/upgrade the system to the point at which the New York City Building Inspector would authorize Con Edison to restore gas service was $556,967.60.
The Policy
The building is insured under a Commercial Lines Insurance Policy, policy number NYP 2006109-15, issued by defendant Fireman's Fund. The policy was in full force and effect on the date of the incident.
Although nominally an "all risks" policy, the policy lists numerous exclusions. One of them-the one most pertinent to this case-is found in the Gas Systems Endorsement. It reads as follows:
1. This policy will not cover the following:
a. costs associated directly or indirectly with the enforcement of any law or ordinance that requires the testing of a gas system for integrity or condition; or
b. any loss to a gas system caused by testing for integrity or condition.
This exclusion does not apply if the testing is required due to a direct loss causing physical damage to Covered Property from Fire; Lightning; Explosion; Aircraft or Vehicles ; Riot or Civil Commotion; Sinkhole Collapse; Volcanic Action; Falling Objects; Weight of Snow, Ice or Sleet that is covered by the policy.
(Lambe Aff., Ex. A9, ECF No. 90-9) (emphasis added).
Fireman's Fund was obviously aware that local law (such as the New York City Administrative Code) might require that the building's gas system be tested for integrity or condition, and that such test might yield various direct (the costs associated with hiring a plumber, conducting the tests and paying fees) and indirect costs (such as the cost of having to access normally inaccessible parts of the system or to *534 upgrade parts so that the system could operate with integrity at higher than normal pressures). Having anticipated the possibility, it specifically excluded all such costs from coverage under the policy.
But as always seems to be the case where insurance policies are concerned, there is an exception to the exemption. If the damage to the Covered Property (and the parties do not suggest that the building's gas meter is not "Covered Property") results from certain specified causes, the exclusion does not apply, and the costs associated with the enforcement of the gas testing ordinance are covered. Among those causes was injury to the covered property caused by "Aircraft or Vehicles. "
Plaintiff takes the position that the recycling bin-which is described by the City of New York as a "storage bin"-qualifies as a "vehicle," in that it has wheels (the better to move it from the laundry room to the place where the recyclers pick it up). Defendants accused Plaintiff of trying to create an ambiguity where none exists and insist that the common understanding of the word "vehicle" would not extend to a trash bin simply because it was mobile.
The policy also excludes coverage for the following:
(1) Wear and tear
(2) Rust, corrosion, fungus, decay, mold, deterioration, hidden or latent defect in any quality in product that causes it to damage or destroy itself;...
(3) [intentionally omitted]
(4) Settling, cracking, shrinking, or expansion.
(Def.'s Statement of Undisputed Facts ("Def.'s 56.1") ¶ 14, ECF No. 92; see also Lambe Aff., Ex. A5, ECF No. 90-5.)
Fireman's Fund denied coverage on the basis of the Gas Systems Endorsement and the "wear and tear" sections quoted above in a letter sent to Plaintiff on or about August 11, 2016 (Lambe Aff, Ex. Bl, ECF No. 90-10.)
The first time that Plaintiff advised Fireman's Fund of its position that the storage bin qualified as a "vehicle" was when the instant complaint was filed. (Def.'s 56.1 ¶ 18.)
DISCUSSION
The principles of law relevant to the determination of this case are as follows:
Summary Judgment
A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c) ; Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp. , 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Whether any disputed issue of fact exists is for the court to determine. Balderman v. U.S. Veterans Admin. , 870 F.2d 57, 60 (2d Cir. 1989).
The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. Celotex v. Catrett , 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving-party must present "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." Scotto v. Almenas , 143 F.3d 105, 114 (2d Cir. 1998).
*535 Not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." Anderson , 477 U.S. at 248, 106 S.Ct. 2505. Finally, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Industries Co. , 475 U.S. at 586, 106 S.Ct. 1348. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. Anderson , 477 U.S. at 248-49, 106 S.Ct. 2505.
Construction of Insurance Contracts[1]
Under New York law, "an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract." Village of Sylvan Beach v. Travelers Indem. Co. , 55 F.3d 114, 115 (2d Cir. 1995). "[T]he initial interpretation of a contract 'is a matter of law for the court to decide.' " K. Bell & Assocs. v. Lloyd's Underwriters , 97 F.3d 632, 637 (2d Cir. 1996) (quoting Readco, Inc. v. Marine Midland Bank , 81 F.3d 295, 299 (2d Cir. 1996) ).
Insurance policies are to be interpreted in the same manner as any other business contract. See Fed. Ins. Co. v. Am. Home Assurance Co. , 639 F.3d 557, 567 (2d Cir. 2011). Therefore, plain or unambiguous language will be given its ordinary meaning and effect. Id.
It is for the court to decide whether any terms in the insurance contract are ambiguous. See Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's , 136 F.3d 82, 86 (2d Cir. 1998). An ambiguity exists where the terms of an insurance contract could suggest "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Lightfoot v. Union Carbide Corp. , 110 F.3d 898, 906 (2d Cir. 1997) (citation and internal quotation marks omitted).
There can be no ambiguity "if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion." Selective Ins. Co. of Am. v. Cty. of Rensselaer , 26 N.Y.3d 649, 653, 655, 27 N.Y.S.3d 92, 47 N.E.3d 458 (2016) (emphasis added). New York courts construe terms in a contract in accordance with their "plain and ordinary meaning." Fed. Ins. Co. , 639 F.3d at 567. "A court may not torture words to import ambiguity ... and words do not become ambiguous simply because lawyers or laymen contend for different meanings." Wards Co. Inc., v. Stamford Ridgeway Assoc. , 761 F.2d 117, 120 (2d Cir. 1985) ; accord Safeco Ins. Co. of Am. v. Lawrence Brunoli Inc. , 599 F. App'x 9 (2d Cir. 2015).
Once a court concludes that an insurance provision is ambiguous, summary judgment is precluded, and "the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." Alexander & Alexander Servs., Inc. , 136 F.3d at 86 ; accord *536 Seiden Assocs. v. ANC Holdings, Inc. , 959 F.2d 425, 428-29 (2d Cir. 1992). But insurance contracts tend to be form contracts, the terms of which are not negotiated, so often there will be little or no such evidence.
If the extrinsic evidence does not yield a conclusive answer as to the parties' intent, a court may apply other rules of contract construction. As a last resort, the court will fall back on the rule of contra proferentem , which generally provides that where an insurer drafts a policy "any ambiguity in [the] ... policy should be resolved in favor of the insured." McCostis v. Home Ins. Co. , 31 F.3d 110, 113 (2d Cir. 1994). "Contra proferentem is used only as a matter of last resort, after all aids to construction have been employed but have failed to resolve the ambiguities." Schering Corp. v. Home Insurance Co. , 712 F.2d 4, 10 n.2 (2d Cir. 1983).
Finally, in a case involving an all-risks policy like the one in suit, it is well-settled where the burden of proof is. Once the insured demonstrates that a loss has occurred, the onus is on the insurance company to show that the loss claimed is expressly excluded from coverage under the terms of the policy. See Fabozzi v. Lexington Ins. Co. , 639 F. App'x 758, 760 (2d Cir. 2016) ; In re Balfour MacLaine Int'l Ltd. , 85 F.3d 68, 77-78 (2d Cir. 1996). The Second Circuit has explained that "It is not sufficient for the all-risk insurer's case for them to offer a reasonable interpretation under which the loss is excluded; they must demonstrate that an interpretation favoring them is the only reasonable reading of at least one of the relevant terms of exclusion." Pan American World Airways, Inc. v. Aetna Casualty & Surety Co. , 505 F.2d 989, 1000 (2d Cir. 1974).
If, however, the insurer meets that burden, the insured must demonstrate that an exception to the exclusion applies. Northville Industries Corp. v. Nat'I Union Fire Ins. Co. of Pittsburgh, PA , 89 N.Y.2d 621, 657 N.Y.S.2d 564, 679 N.E.2d 1044 (1997).
With these principles in mind, we turn to the problem posed by this case.
The meaning of the word "Vehicle" is not ambiguous as used in the exclusions to the Gas Systems Endorsement
The insurer has easily demonstrated that a specific exclusion in the policy applies. Indeed, the Gas Systems Endorsement in the policy appears to have been written with just this situation in mind-a situation in which the gas is shut down because of some accident; the system must be retested before the gas can be turned back on in order to comply with the New York City Administrative Code; and damage to the gas system results from that testing.
However, if the original damage to the gas system is caused by one of a number of specific events, the exclusion in Gas Systems Endorsement does not apply. Both parties agree that the policy covers this loss if the wheeled storage bin for electronic recyclables qualifies as a "vehicle." The principal question presented by this case is whether the bin is a "vehicle."
The policy does not define the word "vehicle" and does not include any descriptive word that would necessarily limit the word to any particular type of vehicle. That said, the lack of a definition in the policy does not necessarily render a term ambiguous. Hawkeye-Security Ins. Co. v. Bunch , 643 F.3d 646, 652-53 (8th Cir. 2011).
Plaintiff argues that the e-cycle storage bin-essentially a trash container mounted on wheels-is a "vehicle" because it literally comports with several dictionary definitions of the word "vehicle" that plaintiff has located. One commonly-used *537 commercial dictionary defines a vehicle as, "a means of carrying or transporting something," Merriam-Webster's Collegiate Dictionary (11th ed. 2003), while the dictionary of our profession, Black's Law Dictionary, includes as one among several definitions of the word, "any moving support or container fitted or used for the conveyance of bulky objects; a means of conveyance," Black's Law Dictionary (5th ed. 1979). These definitions are not limited to motor vehicles and comprehend such man-propelled items as a bicycle, an ox cart, and a wagon.
Plaintiff sees no reason why a large storage bin on wheels, which is used both to store recyclables and to move them from the place where they are stored to the place where they are picked up by a garbage truck, should not be similarly comprehended. After all, it argues, what it the storage bin but a "container fitted... for the conveyance of bulky objects"? The bin is unquestionably a container; it is fitted with wheels; the wheels are affixed to it so that it will be easy to move the contents of the container (some of which could well be bulky, like television sets or computers) from one place to another.
Of course, Black's has several definitions of the word "vehicle," one of which is: "That in or on which persons, goods, etc. may be carried from one place to another, especially along the ground .... Term refers to every device in, upon or by which a person or property is or may be transported upon a highway." Id. As Defendant notes, the storage bin in question cannot be used to transport anything "upon a highway." But this does not trouble Plaintiff, since this particular limitation is found neither in the policy nor in the other dictionary definitions of the word that Plaintiff cites.
Fireman's Fund describes Plaintiff's reading of the word "vehicle" as "tortured" and argues instead for a "common sense" approach to defining the term. It notes that a "storage bin" (which is how the item is described in a brochure provided by the "NYC e-cycle" program that provides it, see Weintraub Decl., Ex. Z, ECF No. 87-54) is not by its nature a "vehicle;" its function is to serve as a trash can, a receptacle for electronic garbage. The insurer contends that it defies common sense to assert that a trash receptacle can be transformed into a "vehicle" simply by mounting it on wheels-even if that makes it easier to push the bin from the place where it ordinarily resides to the sanitation truck (a real vehicle), which will carry the bin's contents to its ultimate destination.
These are the arguments on both sides of this question. The first question raised is, is the language ambiguous?
I conclude that the language is not ambiguous, and that Fireman's Fund prevails because the common understanding of the word "vehicle" in the context in which it is used in the policy does not encompass a storage bin mounted on wheels.
Plaintiff's interpretation relies entirely the fact that a storage bin mounted on wheels to make it more transportable falls literally within some (but not all) dictionary definitions of the word "vehicle." Plaintiff notes that none of those definitions require that a "vehicle" have a motor, or be self-propelled, or even be able to move its contents very far. That is indeed the case. As evidence, one need look no further than a different provision of the New York City Administrative Code-the Industrial Code chapter that contains construction, demolition, and excavation regulations. The chapter has a subpart entitled "Hand-propelled vehicles. " 12 N.Y.C.R.R. § 23-1.28. Subsection (d) of that chapter states, "Curbing at least six inches in height shall be provided along edges over *538 which material or debris is dumped from a hand-propelled vehicle to a lower level." (emphasis added). For purposes of this particular regulation, a wheelbarrow that takes construction debris from one location at a construction site and dumps it onto a lower level is a "vehicle"-even though it is not self-propelled, even though it does not move its contents very far, and even though some much larger, motorized "vehicle" (a truck) will have to be used to get the debris off the construction site and on to its ultimate destination.
Of course, the principal purpose of a wheelbarrow is to move items from one place to another, not to store them; for that reason it is easy to conclude that a wheelbarrow is a vehicle. The principal purpose of the storage bin, by contrast, is to store items, not to move them around; as ordinarily used, a storage bin would not reasonably be understood to be a vehicle. And indeed, if this particular bin did not have wheels, there would be no question that it was not a vehicle.
But Plaintiff would undoubtedly argue that there is no reason why an item cannot be both a "storage container" and a "vehicle." Were one to peek into many a garage or tool shed at the end of the day, s/he would not be surprised to see that the "hand-propelled vehicle" known as a wheelbarrow was not sitting empty, but was filled with pots and trowels and gardening gloves and similar items. The highest and best use of a wheelbarrow may be to move stuff around, but when it is not being used for that purpose, it offers a convenient receptacle to store small items that are often used along with a wheelbarrow. Admittedly, the latter use is purely incidental to the wheelbarrow's real purpose; but "wheelbarrow as storage bin" still falls within the literal concept of a "storage bin" or "container."
That said, the language of the "contracts must be interpreted according to common speech and consistent with the reasonable expectation of the average insured." Dean v. Tower Ins. Co. of N.Y. , 19 N.Y.3d 704, 708, 955 N.Y.S.2d 817, 979 N.E.2d 1143 (2012) (quoting Cragg v. Allstate Indem. Corp. , 17 N.Y.3d 118, 122, 926 N.Y.S.2d 867, 950 N.E.2d 500 (2011) ). "Strained and unnatural readings" of terms in an insurance policy are frowned upon and cannot be relied on to create ambiguities. Colson Services Corp. v. Ins. Co. of N. Am. , 874 F.Supp. 65, 68 (S.D.N.Y. 1994). Plaintiff's reading strikes this Court as "strained and unnatural"-both in accordance with common speech and in light of the context within which the word "vehicle" is used in the actual policy.
While it is true that a wheeled storage bin can be shoehorned into some dictionary definitions of "vehicle," that is not a "common understanding" of what the word "vehicle" means. Black's dictionary of legal terms defines the word vehicle in a manner consistent with carriage of goods on a highway. That would comprehend an ox cart or a bicycle, or other types of non-motorized conveyances, but not what is really nothing more than a movable trash can. As Defendant observes, no matter their etymological definitions, when giving examples of "vehicles," dictionaries identify cars and trucks, not wheeled trash cans or storage bins. Examples, rather than technical definitions, are a better indicator of how the word is employed in "common speech."
So is the testimony of Plaintiff's own employees. Plaintiff's position is that any movable container that can be used to transport things from one to location to another qualifies as a vehicle, but that is not how Plaintiff's resident manager understands the word. At a deposition in this case, John Fitzpatrick, the building's resident *539 manager, testified that a luggage cart-an item mounted on wheels that is commonly used in New York City apartment buildings to transport tenant luggage and packages between the lobby and individual residences-is not a "vehicle." (Weintraub Decl., Ex. V1, 63:11-64:25, ECF No. 87-41.) Yet a luggage cart fits every bit as comfortably within the word's dictionary definition (and perhaps more so) than does a storage bin for recycled trash.
Defendant also notes that the insured never once urged that the loss fell within the "vehicle" exemption until this lawsuit was filed nine months after coverage was declined. That, too, suggests that a common sense interpretation of the word "vehicles" does not include mobile trash cans. Courts are particularly reluctant to ascribe meanings to words that are merely dreamed up by attorneys in the context of litigation.
As legal support for its argument in favor of a "common sense" interpretation, Fireman's Fund relies on the case of Certain British Underwriters at Lloyds of London v. Jet Charter Serv., Inc. , 789 F.2d 1534 (11th Cir. 1986), in which the court concluded that the undefined term "vehicle" as used in an insurance policy was unambiguous and did not cover "aircraft." In that case, the insurer sought to disclaim coverage for damage to an airplane owned by Jet Charter (not the insured) that occurred while the plane was being repaired on the premises of Aero Service (the insured). The insurer relied on an exclusion from coverage for "vehicles that are not the property of the [insured] whilst on the premises specified in the Schedule." Id. at 1536. No adjective limited the word "vehicle" in the relevant exclusion in the policy,[2] and the word was not defined in the policy. Id. at 1536-37. At least one of the several dictionary definitions cited by the court identified "aircraft" and even "space vehicle" as types of "vehicles;" and at least one court (the Iowa Supreme Court) had concluded that, in an era of flight, the meaning of the word could not longer be limited to vehicles traveling over land. Id. at 1537 (citing McReynolds v. Mun. Court of City of Ottumwa , 207 N.W.2d 792, 795 (Iowa 1973) ).
Nonetheless, the court (in a 2-1 opinion) concluded that the policy unambiguously excluded aircraft from the ambit of the word "vehicle." It did so for two reasons.
First, the policy, when read as a whole, plainly distinguished between "vehicles" and "aircraft." The exclusion at issue in the case applied strictly to "Vehicles;" however, an entirely separate exclusion in the policy specifically applied to "Ships, Vessels, Craft or Aircraft," but not "Vehicles." Interpreting the words "vehicles" in the first exclusion to comprehend aircraft (or ships or vessels) would have rendered the second exclusion superfluous. Id. The majority also cited several Florida statutes that applied separately to "vehicles" and "aircraft."[3] Certain British Underwriters , 789 F.2d at 1538.
Second, the majority concluded that there was a "difference between the etymological meaning and the man-on-the-street concept of 'vehicle '[that] has been recognized by almost all modern-day court decisions interpreting that word." Id. at 1537. For this proposition it relied on the dissent in the above-mentioned *540 McReynolds case, in which dissenting Justice Reynoldson concluded that the "man-on-the-street" would understand the word vehicle as referring only to things that traveled along the ground, not through the air. McReynolds , 207 N.W.2d at 799.
Certain British Underwriters is an interesting case, but it is far from squarely on point. It certainly does not stand for the proposition that the term "vehicle" is limited to motor vehicles or vehicles that travel along highways, which is what Fireman's Fund suggests.
But Certain British Underwriters is important because it stands for the well-settled proposition that one cannot determine the meaning of words in an insurance policy just by looking them up in a dictionary; instead, one must read the policy as a whole for clues about meaning. In Certain British Underwriters , it was clear from the policy, read as a whole, that the word "vehicles" could not possibly comprehend "aircraft," no matter what the dictionary said.
Reading the policy in this case as a whole, rather than focusing on the singular word "vehicles," provides a very useful clue about the meaning of that word. When one reads the list of exceptions to the exclusion in its entirety-"Fire; Lightning; Explosion; Aircraft or Vehicles; Riot or Civil Commotion; Sinkhole Collapse; Volcanic Action; Falling Objects; Weight of Snow, Ice or Sleet"-what becomes immediately significant is the fact that the word "vehicle" is not used by itself, in the way that the words "Fire," Lightning" or "Sinkhole Collapse" are. (Lambe Aff, Ex. A9, ECF No. 90-9.) Instead, "vehicle" is one half of a single category of items. The policy covers consequential damage from gas system integrity testing if the gas leak that occasioned the shutdown was caused by, inter alia , "Aircraft or Vehicles"-not "Aircraft, Vehicles," or "Aircraft and Vehicles."
The significance of this linkage is twofold.
First, it means that everything that might fall within the dictionary definition of the word "vehicle" is not necessarily a "vehicle" for purposes of this particular exception to an otherwise applicable coverage exclusion in this particular insurance policy. In the policy in suit, just like in the policy in Certain British Underwriters , "Aircraft" cannot possibly be "Vehicles"-even though Aircraft, just like storage bins on wheels, literally fall within many dictionary definitions of the word "vehicle." That being so, the reader of the policy as a whole must conclude that not everything that qualifies etymologically as a "vehicle" is comprehended by that word for purposes of this particular insurance policy. That alone makes Plaintiff's singular reliance on certain dictionary definitions of the word far less persuasive.
Second, as used in this particular policy, "Aircraft" and "Vehicles" must be related, because they are not separates exceptions to the Gas Systems exclusion, but two aspects of a single exception to the exclusion-"Aircraft and Vehicles." From this I infer that they should probably be understood as being the same general type of thing. This, too, suggests that Plaintiff's reliance on etymological understandings is incorrect, because a trash container on wheels is not the same general type of thing as an "aircraft." A machine meant for travel and transport along a highway, such as a car, a truck, or even a bicycle, is the same general type of thing as an "aircraft," which is a machine meant for travel and transport through the air.[4] A wheeled storage cart is not.
*541 Finally, "Aircraft and Vehicles" are but one of nine separate causes of damage, all of which can fairly be said to qualify as catastrophic. A fire in an apartment building is catastrophic. An explosion is catastrophic. A sinkhole opening in the ground or a volcano erupting is catastrophic. Riots in the streets are catastrophic. An object falling out of the sky is catastrophic. And it would be catastrophic if a car or truck or airplane of helicopter crashed into the building and damaged the gas line. Thus, the list of exceptions to the Gas Systems Exclusion, read as a whole, can fairly be said to comprehend various event of catastrophic magnitude that might damage the building's gas system.
A storage bin bumping against a gas meter is not in the same category of event, whether the bin has wheels or not. It is more closely akin to a toy airplane (or even a paper airplane) hitting the gas meter. No one could plausibly argue that a toy airplane (even one that had motor and could fly using a remote control device) was an "aircraft" within the meaning of a list of natural disasters and genuinely catastrophic events.
Putting all of this together, I conclude that the word "vehicle" as used in the phrase "Aircraft and Vehicles" in the list of exceptions to the Gas Systems Exclusion is unambiguous and does not comprehend an object like a storage bin-even if that bin has wheels for added mobility.
For this reason Defendant's motion for summary judgment is granted and the complaint is dismissed.
In the Alternative, Plaintiff's Motion for Summary Judgment Is Conditionally Granted Except Insofar As It Relates to the Meaning of the Word "Vehicle"
Because insurance policies are read seriatim, and not cumulatively, the fact that Defendant prevails on the Gas Systems Exclusion exception to coverage disposes of the case. However, Fireman's Fund has raised three other objections to coverage in connection with this incident. While I need not reach those issues, I prefer to address them now.
As to all three, Plaintiff is entitled to summary judgment.
The first of Defendant's alternative grounds for declining coverage is that the insured has not "definitively proved" how the damage in this case was caused. It should be apparent from the Court's summary of the undisputed facts that I reject that argument. All the evidence in the record, while admittedly circumstantial, leads inexorably to the conclusion that the damage was caused either when the old recycling bin was taken out, or (more likely) when the new, larger one was wheeled back in. The undisputed evidence demonstrates that there was no smell of gas until after the recyclers left; and that both the smell of gas and the damage to the gas meter became apparent shortly after their departure from the premises.
The second alternative ground relied on by Fireman's Fund is that coverage is excluded because the damage was caused by wear and tear. As to that argument, my late colleague Judge Duffy's well-reasoned opinion in 20 East 35 Owners Corp. v. Great Am. Ins. Co. , 1996 WL 438172 (S.D.N.Y. Aug. 5, 1996), is entirely on point and persuasive.
In that case, as in this one, a leak (there caused by someone drilling into a gas pipe) occasioned the shutdown of gas service to a residential apartment building in New York City. Pursuant to the same administrative ordinance that applies here, the building's gas system had to pass an integrity *542 test before the gas could be turned back on-a test that, as observed by Fireman's Fund's expert witness, Steve Pietropaolo, "is conducted at pressures above normal system pressure and therefore would also be expected to cause additional leakage in an old [gas] system." (Aff. of Steven Pietropaolo, Ex. A2 at 30, ECF No. 88-2.) As here, the building in Judge Duffy's case had an older gas system, but there was no evidence of any issue with its proper functioning until the drill broke into the pipe and caused the leak. As here, there was an exclusion in the policy for wear and tear. And as here, an expert witness testified that elements of the system (in that case, the gas cocks) had become worn over the years and would not withstand the extreme pressure of the integrity test.
Judge Duffy made short work of the insurer's reliance on the "wear and tear" exclusion:
Even though the gas supply system would have failed the extreme pressure test due to wear and tear, the fact remains that, until that time, the system was in proper working order and the gas cocks could withstand the gas pressure under normal working conditions. In fact, the building superintendent reported that the building had "no history of gas leaks or repairs to the gas supply system over the past seven years." Prior to the mandatory pressure testing, the deterioration of the gas supply system was inconsequential. As such, the damages complained of herein, that is the required replacement of the gas cocks and portions of the walls, resulted not from deterioration or wear and tear, but from the rupturing of the gas pipe.
20 East 35 Owners Corp. , 1996 WL 438172, at *3 (internal citations omitted).
The same reasoning applies here. The uncontroverted evidence shows that, despite the age of the gas system at 1070 Park Avenue, there were no problems with its operation until it was subjected to high pressure testing-testing at twenty times the pressure under which the system ordinarily operated. (See Lambe Aff., Exs. Bl & B2, ECF No. 90-10, 90-11; Weintraub Decl., Ex. W2, 63:11-64:25, ECF No. 87-46.) Kraus EBT, Weintraub Ex. W, at 56-57. It was the need to pass that high pressure test, not ordinary use (i.e., "wear and tear"), that required the opening of kitchen walls, the replacement of gas cocks and flex connector valves. Following the reasoning of the 20 East 35 Owners Corp. decision, wear and tear did not cause the damage of which the building complains; the damage to the gas meter and the resulting gas leak did.
Exactly the same reasoning compels the conclusion that Fireman's Fund cannot rely on the exclusion for faulty, inadequate or defective maintenance of the system to deny coverage, which is the third alternative ground on which it relied. The "deterioration" of, or defect in, the system must have been the cause of the damage to the system for this exclusion to apply; put otherwise, the policy clearly states that, to fall within the exclusion, the deterioration (which would have been occasioned by faulty or defective maintenance) must "cause [the system] to damage or destroy itself." (Lambe Aff., Ex. A5, ECF No. 90-5.) Here, the repairs to the system were occasioned by the need for the system to pass a high pressure inspection test; the system did not "damage or destroy itself because it had been poorly maintained and so was defective.
CONCLUSION
For the above reasons, Defendant's motion for summary judgment is GRANTED. Plaintiff's motion is conditionally granted to the extent of its argument that Fireman's *543 Fund cannot rely on "failure to prove the cause of the accident," "wear and tear," or "faulty, inadequate or defective maintenance" to avoid coverage under the policy.
The Clerk is directed to remove the motions at Docket Numbers 87 and 93 from the Court's list of open motions.
This constitutes the decision and order of the Court.

A particularly helpful summary of New York's law on the construction of insurance contracts can be found in Morgan Stanley Group v. New England Insurance Company , 225 F.3d 270 (2d Cir. 2000). Much of what follows immediately below is taken directly from that opinion, at pages 275-276.

The reference in the Eleventh Circuit's opinion to "motor vehicles" was found in a quotation from a case it was discussing; the word "motor" did not appear in the policy at issue in Certain British Underwriters .

Of course, the court was forced to admit that at least one Florida statute comprehended aircraft within the definition of "vehicles." Jet Charter Serv., Inc. , 789 F.2d at 1538.

Whether the machine is motorized or not is irrelevant; a hang glider and a hot air balloon are non-motorized aircraft; but a kite or a paper airplane is not.